# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Lonvick*, 2013 IL App (2d) 120865

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ERIC LONVICK, Petitioner and Counterrespondent-Appellee and Cross-Appellant, and LINDA LONVICK, Respondent and Counterpetitioner-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket Nos. 2-12-0865, 2-12-0895 cons. |
| Filed | August 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the dissolution of the parties' marriage, the award of custody of their child to petitioner was upheld over respondent's contentions that she did not have a mental disorder and that she was not overprotective of the child, and, further, the report of a court-appointed evaluator was properly admitted over respondent's claim it was impermissible hearsay and was improperly accepted as substantive evidence, and the award of $120,000 in attorney fees to respondent was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-D-1555; the Hon. Paul A. Marchese and the Hon. Robert J. Anderson, Judges, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Aldo E. Botti and Jean M. Lasics-Wessels, both of Botti Law Firm, P.C., of Oak Brook, for appellant. |
| | Bryan S. Estes, of Law Offices of William J. Stogsdill, Jr., P.C., of Wheaton, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Hutchinson concurred in the judgment and opinion. |

## OPINION

¶ 1    Respondent, Linda Lonvick, appeals from the judgment of the Du Page County circuit court awarding custody of the parties' minor child, E.L., to petitioner, Eric Lonvick, and from the order denying her motion to reconsider. Specifically, Linda contends that the child custody determination is against the manifest weight of the evidence. Additionally, Linda contends that the trial court erred when it (1) denied her motion for substitution of judge for cause; (2) admitted into evidence a court-appointed evaluator's report prepared pursuant to section 604(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604(b) (West 2010)); (3) accepted and relied on the testimony of the evaluator that was allegedly hearsay; and (4) ruled that funds that Eric received from his father during the marriage were gifts, and therefore nonmarital property, and that no commingling with the marital estate occurred. Eric cross-appeals from the judgment of the trial court awarding $120,000 in attorney fees to Linda. For the reasons set forth herein, we affirm the judgment of the trial court.

¶ 2                              I. BACKGROUND

¶ 3    Eric and Linda were married on October 2, 2004; they had one child, E.L., born August 22, 2005. In November 2009, Linda left the marital residence in Glen Ellyn, Illinois, with E.L. and moved into a women's shelter; Linda and E.L. then returned home after 16 days. On July 9, 2010, Eric filed a petition for dissolution of marriage, and on July 12 Linda filed a counterpetition. On July 17, Linda and E.L. moved out of the marital home and stayed with a friend, Ingrid Zynga, in Glen Ellyn, for eight weeks. Thereafter, she and E.L. moved into an apartment in Wheaton, Illinois.

¶ 4    Prior to trial, on July 2, 2011, Eric filed a motion to enroll E.L. in kindergarten in Glen Ellyn, the district where Eric resided, as opposed to Wheaton, the district where Linda resided with E.L. After an evidentiary hearing on August 16, to which Linda objected, the

trial court, Judge Paul A. Marchese presiding, granted Eric's motion, stating that, because E.L. had lived in the Glen Ellyn school district until he and his mother moved from the marital home, and was familiar with the neighborhood and the school, it was in E.L.'s best interest to attend the Glen Ellyn school.

¶ 5 On August 22, 2011, Linda filed a motion for substitution of judge for cause that was heard on September 2, by Judge Robert J. Anderson. The motion alleged that because Judge Marchese ordered that E.L. attend kindergarten in Glen Ellyn, he had predetermined a factor under section 602(a)(4) of the Act (750 ILCS 5/602(a)(4) (West 2010)), pertaining to E.L.'s adjustment to his home, school, and community. On September 2, Judge Anderson denied the motion, finding that there was no showing of actual prejudice, and returned the case to Judge Marchese. The case proceeded to trial before Judge Marchese, commencing October 20, 2011.

¶ 6 At trial, Eric testified that he purchased a home in Glen Ellyn in 1991, prior to the marriage, and kept it in his name alone. Linda moved in when they married and continued to reside there until 2010 when she moved out. At the time of his testimony, Eric was 51 years old and he had been employed by Walgreens as senior database administrator since 2005. In 2005, he obtained a master's degree in computer science from DePaul University. He was in good health, but suffered from sleep apnea and used a CPAP machine to help him breathe at night. For 20 years he had volunteered as a member of the National Ski Patrol.

¶ 7 Eric testified extensively regarding his relationship with E.L. and the activities they shared, which included skiing, T-ball, Sunday school, and visiting extended family. Additionally, Eric tried to have E.L. participate in activities through the Y.M.C.A. and the Glen Ellyn Park District and in an early development class at the College of DuPage (C.O.D.). Eric testified that Linda either withdrew E.L. from programs Eric had enrolled him in or objected to his participation.

¶ 8 Eric further testified that E.L. had his own bedroom and bathroom at the marital home. If Eric had custody, E.L. would attend a morning "kindergarten roundup" at the Y.M.C.A. and its bus would then take him to kindergarten at Ben Franklin School in Glen Ellyn. After school, four different families would be able to assist if Eric had work obligations.

¶ 9 Eric testified that during the marriage his father had gifted him with money via checks that were made out to Eric as payee and were deposited into various investment and individual retirement accounts. His father also contributed money directly to a checking account that was held solely in Eric's name.

¶ 10 Linda testified that she was 48 years old, in good health, and not currently taking any medications. She had a bachelor's degree from Columbia College in art and design and had last worked in that field in 1992. Since 2005, she had been the primary caregiver for E.L. and had not worked outside the home.

¶ 11 Linda stated that early in their marriage Eric choked her and threatened to "chop [her] into pieces." She testified that he would not give her enough money to buy food and would not allow her to spend money on anything for their home.

¶ 12 Linda also testified that "checks from Grandpa Lonvick" were deposited into the investment accounts that were held jointly. On cross-examination, Linda testified that none

of the checks from Eric's father were made out to her and that the checks were deposited into various accounts. Linda also testified that sometimes a check was deposited into a joint account and then Eric would transfer money into an Ameriprise account held solely by him.

¶ 13    Dr. Gerald Blechman, the court-appointed evaluator, testified that he prepared a section 604(b) custody evaluation report, applying each of the factors contained in section 602 of the Act. See 750 ILCS 5/602 (West 2010). Dr. Blechman met with Linda, Eric, and E.L. on multiple occasions; he also interviewed Dr. James Natter, Dr. Ellen Keating, and Jahn O'Brien, Eric's next-door neighbor. Dr. Blechman also received letters from Zynga and Dorothy Lance, Linda's mother. Blechman recommended that Eric be granted sole custody subject to "reasonable visitation" as set forth in his report. Dr. Blechman testified that Linda was "overprotective" and that, when he observed E.L. with Linda, E.L.'s behavior was "very passive, relatively nonverbal, constricted." When Dr. Blechman observed E.L. with his father, he was more verbally expressive, had more ideas of his own, and "in general, appeared to be a different child."

¶ 14    Dr. Keating's testimony was allowed for the purpose of impeachment of Dr. Blechman's testimony regarding what he had considered in forming his opinion. Dr. Keating testified that she was a clinical psychologist and had counseled Linda intermittently between 2005 and 2007. She diagnosed Linda with an "adjustment disorder," *i.e.*, "life stressors that cause upset." She testified that she told Dr. Blechman "something to the effect of there was nothing in my observations or conclusions at the time that would preclude her from being an adequate parent." She also stated that, as her observations were from 2005 to 2007 and she was testifying in 2011, "it has been a long time."

¶ 15    Several other witnesses testified at trial. Lance testified that, on May 20, 2009, Eric punched Linda with a closed fist and she heard Linda yell. She called to her husband to help Linda. O'Brien testified regarding the same altercation; she observed Linda slap Eric on his arm with an open hand and Eric immediately slap her back the same way. O'Brien did not hear any yelling, screaming, or crying.

¶ 16    O'Brien and E.L.'s babysitter, Natalie Nestrok, each testified about an occasion when Eric was riding his bike on the sidewalk while pulling E.L. in a bike trailer. They both stated that Linda ran after Eric and shouted at him that he was riding too fast. Nestrok stated that there was nothing unusual or concerning about how Eric was riding with E.L. in the trailer.

¶ 17    Jean Spyksma, music minister at Eric's church, testified that she had known Eric and Linda since their wedding and that Eric had been bringing E.L. to church regularly. She observed E.L. to be happy and bubbly, not fearful or frightened of other children.

¶ 18    City of Wheaton police officer James Craig testified for Eric on rebuttal that on January 27, 2012, he and another officer responded to a call at Linda's apartment in Wheaton. Eric met them in the parking lot and told them that he was there to pick up his son and that Linda "was not letting the child come out." Officer Craig and the other officer then went to Linda's apartment and spoke to her in the hallway, where she told them that E.L. did not want to go with his father and that she was not going to force him. They entered the apartment and saw E.L. watching television; Linda sat down next to him on the couch. Officer Craig testified that she put her arm around E.L. and her other hand on his knee. Officer Craig stood about

10 feet away and the other officer was in the doorway to the apartment. Linda raised her hand and told them in a "slightly elevated voice" to "stop, get back, give him room to breathe." Officer Craig then went outside and called the supervisor, and the decision was made that, because E.L. was six years old, "[s]he needed to present the child for visitation, or we would be forced to do a charge for unlawful visitation and [*sic*] interference." He stated that E.L. was "a little kid" and "seemed scared when I went into the apartment."

¶ 19 On cross-examination, Officer Craig stated that he had been wearing his uniform with his badge and had his gun in his holster. He stated that "[u]nder these particular circumstances, it seemed to me that [Linda] was being a little oversensitive about the whole situation." He also stated that he thought it odd that she had her arms around E.L. and was patting his knee, "like we're going to come in there and beat him with our clubs or something."

¶ 20 On March 20, 2012, the trial court issued its ruling and read its memorandum opinion in open court. Regarding custody, the court considered all the relevant factors, including those in section 602 of the Act. The court noted that both parents wished to be the custodial parent, and that, during the marriage, while Eric was working, Linda was a homemaker and was responsible for E.L. Until Linda moved with E.L. to Wheaton, he had lived in Eric's home in Glen Ellyn. While E.L. lived with Linda, there was no temporary designation of custody and Eric had regular visitation with E.L.

¶ 21 The trial court noted that Dr. Blechman conducted a thorough investigation and it found his testimony and conclusions credible. Dr. Blechman concluded that there was a significant difference in E.L.'s interaction and interrelationship with Linda and with Eric. When Dr. Blechman observed E.L. with Eric, E.L. was animated, verbal, and happy; notably, when E.L. was with Linda, he spoke very little and was passive. Dr. Blechman found Linda to be fearful and anxious. The trial court noted that Dr. Blechman's findings regarding Linda's "overprotectiveness" were corroborated by three witnesses, including Officer Craig. The trial court also noted that Dr. Natter had counseled Linda and Eric together for two years and had diagnosed Linda with an anxiety disorder. The trial court further found that Dr. Keating's testimony did not impeach Dr. Blechman. The trial court then found that Linda had a "mental disorder such that her ability to be a sole custodian [was] seriously impaired."

¶ 22 The trial court found that Linda's allegations of physical abuse were not credible. The trial court further found that Eric demonstrated "more willingness and ability to facilitate and encourage a close and continuing relationship" with Linda than Linda did with Eric. Additionally, the trial court noted:

"While both parties indicated that they appreciate the role of the other parent in their child's life, [Linda's] actions are dispositive. Apart from signing up [E.L.] in the Wheaton school district, signing [Eric's] name to documents to withdraw [E.L.] from C.O.D., and withdrawing [E.L.] from activities without consulting [Eric] during the trial in this matter, on different occasions when it was time for [E.L.] to go with [Eric] for visitation, [Linda] wished to be with [E.L.] instead [and] delayed visitation."

The trial court then found that the parties did not have the ability to cooperate as required for joint custody (see 750 ILCS 5/602.1 (West 2010)) and awarded E.L.'s sole care and custody

to Eric, subject to Linda's visitation rights. Linda was ordered to pay child support to Eric.

¶ 23 In awarding rehabilitative maintenance to Linda, the trial court considered the statutory factors. The trial court noted that, although the marriage lasted only seven years, "the Court is mindful of the disparity of nonmarital assets and income of the parties and the present and future earning capacities." The trial court also noted that during the course of the marriage Linda was a stay-at-home mother by agreement of the parties, and the trial court considered the testimony regarding Linda's "emotional health." The trial court ordered Eric to pay maintenance in the amount of $3,000 per month for a period of 36 months, after which Linda could petition for review.

¶ 24 Regarding nonmarital property, the trial court noted that: Eric testified as to gifts he received from his father; "the presumption of gift to the marriage can be rebutted by clear and convincing evidence if the elements of gift are satisfied"; and Eric's father gave him checks payable to him alone or made deposits into specific accounts held in Eric's name alone. The court found that these checks and deposits were intended as gifts; were unconditional and without consideration; involved family; were irrevocable; and were accepted. In addition, there was no evidence of record of commingling the gifts with the marital estate.

¶ 25 On April 11, 2012, the trial court entered its judgment for dissolution of marriage, awarding Eric sole custody of E.L., with child support payable from Linda to Eric. Additionally, the trial court ordered Eric to pay Linda maintenance in the amount of $3,000 per month for 36 months, after which the maintenance would be reviewable. Eric was also ordered to pay $120,000 in attorney fees directly to Linda's attorneys.

¶ 26 Eric's motion to reconsider the attorney fee award was denied on July 10, 2012. The trial court noted the disparity in Eric's and Linda's incomes, and the fact that Linda was unemployed and had been caring for E.L. during the pendency of the trial.

¶ 27 On the same date, the trial court granted in part and denied in part Linda's "Motion to Reconsider and/or Vacate Judgment for Dissolution of Marriage." The trial court granted Linda's request to receive notice from E.L.'s medical, dental, and educational providers and notice from Eric as to E.L.'s extracurricular activities. In denying the motion to reconsider as to the admission of Dr. Blechman's report, the trial court stated, "what I gave weight to was Dr. Blechman's live testimony in court. If I completely put Dr. Blechman's written report aside and did not read it or consider it at all, [his] oral testimony in live court is what carried the day." The trial court further stated that Nestrok's and Officer Craig's testimony corroborated Dr. Blechman's observations.

¶ 28 Linda timely appealed. Eric cross-appealed the portion of the judgment awarding $120,000 to Linda for attorney fees.

¶ 29 II. ANALYSIS

¶ 30 As a preliminary matter, we note that this case involved a flurry of motions pertaining to the filing of briefs. This court granted Linda leave to file her opening brief *instanter* because the report of proceedings needed to be corrected due to errors and omissions. On November 5, 2012, Eric timely filed his "reply" brief but, in doing so, addressed only the

issue concerning attorney fees raised by his cross-appeal. In turn, the discussion in Linda's reply brief, filed November 26, was limited to that one issue. On December 3, this court allowed Eric to file a second brief which addressed the remaining issues. We denied Linda's motion to strike but granted her additional time to file a response.

¶ 31 Illinois Supreme Court Rule 343 (eff. July 1, 2008) requires a cross-appellant to "file a single brief as appellee and cross-appellant at the time his or her brief as appellee is due; the appellant's answer to the arguments on the cross-appeal shall be included in appellant's reply brief." Thus, Eric should have filed a single brief; however, for purposes of this appeal, we will treat Eric's two briefs as one. Additionally, we note that these matters, including Linda's motion for leave to file her opening brief *instanter* and motion for additional time to file her response, prevented the timely disposition of this appeal within 150 days pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010).

¶ 32                                    A. Custody

¶ 33 We first consider Linda's argument that the trial court's custody judgment is against the manifest weight of the evidence. We will not disturb a custody determination unless it is against the manifest weight of the evidence. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181 (2002). "A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based upon the evidence." *Id.* at 181-82. In determining custody, the primary consideration is the best interest and welfare of the children involved. *Prince v. Herrera*, 261 Ill. App. 3d 606, 611 (1994). Under section 602 of the Act (750 ILCS 5/602 (West 2010)), the court is to consider all relevant factors, including the following, in determining the best interest of the children:

"(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing or repeated abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, whether directed against the child or directed against another person;

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; [and]

(9) whether one of the parents is a sex offender[.]" 750 ILCS 5/602 (West 2010).

Linda correctly points out that stability and continuity are in the best interest of a child and that there is a presumption in favor of the present custodial parent. See *Ricketts*, 329 Ill. App. 3d at 180. This does not mean, however, that the presumption controls every situation. "The

-7-

trial court's custody determination is afforded 'great deference' because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child." *Id.* at 177 (citing *In re Marriage of Gustavson*, 247 Ill. App. 3d 797, 801 (1993)).

¶ 34　Linda contends that, of the factors set forth above, the following are of primary importance in this case: (1) her mental health; (2) Eric's physical violence; (3) the interaction and interrelationship of E.L. with each parent; and (4) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and E.L.

¶ 35　Linda avers that she does not have a mental disorder; that she is not a fearful and anxious person; and that she is not overprotective of E.L. The trial court heard testimony from various sources and specifically relied on the testimony of Officer Craig, Nestrok, and O'Brien regarding Linda's mental state. Each of these witnesses related instances when Linda had exhibited excessive fearfulness and anxiety. Dr. Blechman testified extensively about Linda's fears, and he concluded that she suffered from a mental disorder. The trial court noted that, after carefully reviewing Linda's testimony and demeanor, it found that she had exhibited "irrational overprotectiveness" toward E.L.

¶ 36　The trial court also found that Linda's allegations of abuse or physical violence were not credible. She related an incident that allegedly happened early in the marriage where Eric choked her and threatened to "chop [her] into pieces." The trial court noted that Linda took no action such as seeking an order of protection or bringing criminal charges. While it is true that not every person who is abused pursues legal remedies, credibility of the witnesses was the real issue in this case. Linda and Lance testified that Eric "punched" Linda. Regarding this allegation, the trial court noted that Lance was unable to observe the incident and that her testimony was impeached. Linda's own version of the incident was contradicted by O'Brien, who did have an opportunity to observe, and the trial court specifically found that Linda slapped Eric "with an open hand and that he then slapped her back with an open hand." The court concluded that "there was no credible evidence of abuse or physical violence."

¶ 37　As to the third factor, the interaction and interrelationship between E.L. and each parent, she argues that E.L. "acts no differently with his father than he does with his mother." However, Dr. Blechman testified that, when he observed E.L. with Linda, E.L.'s behavior was "very passive, relatively nonverbal, constricted." During Dr. Blechman's observations of E.L. with Eric, E.L. was more animated and verbal, and he interacted with Eric more positively. The trial court also viewed videos that Linda introduced of family holidays and E.L.'s activities. We defer to the trial court's assessment.

¶ 38　Regarding the fourth factor, Linda avers that there was insufficient proof that Linda does not have the ability to facilitate and encourage a close relationship between E.L. and Eric. However, the trial court pointed out that Linda's actions were dispositive; she secretly registered E.L. in the Wheaton school district, signed Eric's name to documents in order to withdraw E.L. from the C.O.D. program, and withdrew E.L. from various activities without consulting Eric. Additionally, during the trial, Linda delayed Eric's visitation on occasions when she wished to be with E.L.

¶ 39    A trial court's custody decision is entitled to great weight. *Gustavson*, 247 Ill. App. 3d at 801 ("Great deference must be accorded the trial court's custody determination since the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child."). We determine that the trial court's decision is not against the manifest weight of the evidence presented at trial. We reject Linda's position that the opposite conclusion is clearly evident and that the ruling is unreasonable, arbitrary, or not based on the evidence presented. See *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006).

¶ 40    For all these reasons, we affirm the trial court's ruling awarding Eric sole custody of E.L.

¶ 41                    B. Dr. Blechman's Report and Testimony

¶ 42    Linda argues that the trial court erred when it admitted into evidence Dr. Blechman's section 604(b) report, because the report is impermissible hearsay. Under section 604(b) of the Act the trial court "may seek the advice of professional personnel, whether or not employed by the court on a regular basis." 750 ILCS 5/604(b) (West 2010). Advice given by the professional personnel "shall be given in writing and made available by the court to counsel." *Id.* Additionally, section 605(a) of the Act provides that, in a contested custody proceeding, the trial court "may order an investigation and report concerning custodial arrangements for the child." 750 ILCS 5/605(a) (West 2010). The trial court "may examine and consider the investigator's report in determining custody." 750 ILCS 5/605(c) (West 2010). This court has held that a trial court erred when it excluded an investigator's report on the basis that it was hearsay. *In re Marriage of Noble*, 192 Ill. App. 3d 501, 510 (1989). This court interpreted section 605(c) to be an exception to the hearsay rule, and it also pointed out that any party may call the investigator for cross-examination. *Id.* at 511; see also *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950, 956 (1993) ("Thus, section 605(c) of the Act provides that a report submitted under this section is an exception to the hearsay rule.").

¶ 43    Linda's argument fails because it is illogical. The Act allows a trial court to seek advice and guidance and to order an investigation and report in making a custody determination. Denying the court the ability to consider the advice contained in an appointed evaluator's written report would make no sense. The statute is clear, and case law supports the trial court's decision.

¶ 44    We note that the trial court specifically explained the basis for its finding and that its remarks when denying Linda's motion for reconsideration are especially clear. The trial court reiterated its position that, even without the written evaluation, Dr. Blechman's *testimony* was credible and corroborated by other witnesses. See generally *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 389 (2004) (noting that, absent evidence to the contrary, a trial court is presumed to have considered competent evidence).

¶ 45    Linda also contends that Dr. Blechman's testimony regarding what he was told by Dr. Natter and Dr. Keating was improperly accepted by the trial court as substantive evidence. Linda cites *People v. Leach*, 391 Ill. App. 3d 161 (2009), and *Kim v. Nazarian*, 216 Ill. App. 3d 818 (1991), for her argument that "[a]n expert witness may testify regarding the contents of his report and records relied upon; however, the information introduced to show the bases of the opinions are hearsay and not substantive evidence." We first note that *Leach* was

vacated by the Illinois Supreme Court (see *People v. Leach*, 237 Ill. 2d 575 (2010) (supervisory op.)), which ultimately held that because an autopsy report prepared by a medical examiner was "neither 'the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial' [citation], nor prepared for the primary purpose of providing evidence in a criminal case [citation]," it was properly admitted because it was nontestimonial. *People v. Leach*, 2012 IL 111534, ¶ 137.

¶ 46    Linda also relies on *Kim*, a medical malpractice case where this court held that two of the defendant's expert witnesses were erroneously allowed to testify that the opinions of nontestifying physicians corroborated their opinions. *Kim*, 216 Ill. App. 3d at 826. The *Kim* court addressed the federal rule that allowed an expert to give an opinion based on information reasonably relied upon by experts in the particular field, even if the information is not otherwise admissible. Fed. R. Evid. 703 (eff. Oct. 1, 1987). In *Kim*, the experts testified that they did not actually rely on the nontestifying physicians' opinions before forming their own opinions, and, therefore, allowing the testimony to the out-of-court opinions violated the rule against hearsay. See *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 908 (1997) (a medical malpractice case distinguishing *Kim* on the basis that the testifying head obstetrical nurse reviewed the deposition of an on-duty nurse to give her an understanding of the case and that she relied on that deposition in arriving at her opinion; unlike in *Kim*, the on-duty nurse's testimony was not elicited to merely corroborate). In this case, Dr. Blechman made his recommendations based on personal observation, interviews with Dr. Natter and Dr. Keating, and interviews with and correspondence from the parties' friends, neighbors, and family members. We determine that the trial court did not err when it admitted Dr. Blechman's testimony.

¶ 47                                            C. Nonmarital Funds

¶ 48    Next, Linda argues that $66,000 that Eric's father gave to Eric during the course of the marriage should have been allocated as marital property. Marital property is statutorily defined as "all property acquired by either spouse subsequent to the marriage." 750 ILCS 5/503(a) (West 2010). Property obtained by gift, legacy, or descent is excepted from marital property and is classified as nonmarital property. 750 ILCS 5/503(a)(1) (West 2010). The trial court's decision to classify property as either marital or nonmarital will not be reversed on appeal unless the decision is contrary to the manifest weight of the evidence. *In re Marriage of Smith*, 265 Ill. App. 3d 249, 253 (1994). "Ultimately, the determination whether an asset is marital or nonmarital is a question of fact which rests upon the trial court's determination of the credibility of the witnesses and the weight to be accorded their testimony." *Id.* at 252-53.

¶ 49    In addition to the presumption that property obtained during a marriage is marital property, there is a presumption that a transfer from a parent to a child is a gift. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 88. In a case where a determination of the nature of property is subject to these conflicting presumptions, the presumptions are considered to cancel each other out. *Id.* "In other words, the presumption that all property acquired after marriage is marital property is canceled out by the conflicting presumption of

a gift from a parent to a child, and, thus, the trial court is free to determine the issue of whether the asset in question was marital or nonmarital property without resort to either presumption. [Citation.]" *Id.*

¶ 50    The trial court heard Eric's and Linda's testimony regarding the money from Eric's father. Their testimony conflicted in part as to where checks were deposited, but it was clear that Eric's father either deposited money directly into Eric's bank account or wrote checks with Eric as the sole payee. Therefore, we conclude that the trial court's determination that the $66,000 was nonmarital property is not against the manifest weight of the evidence.

¶ 51                          D. Substitution of Judge

¶ 52    Finally, Linda asserts that the trial court erred when it denied her "motion for substitution of judge for cause" brought pursuant to section 2-1001(a)(3) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1001(a)(3) (West 2010)). In her motion, Linda asserted that, in granting Eric's motion to enroll E.L. in kindergarten in Glen Ellyn, the trial court had "predetermined the relevant [custody] factor of [E.L.'s] adjustment to his home, school and community," a factor under section 602(a)(4) of the Act. 750 ILCS 5/602(a)(4) (West 2010). The motion was heard and denied by Judge Anderson on September 2, 2011. Linda's affidavit in support of her motion merely recited the facts presented to Judge Marchese and then stated that he had "predetermined a factor of custody and has rendered an opinion and its ruling on the merits–of minor child's adjustment to his home, school and community–which is a factor when determining best interest in a custody hearing." Linda then concluded that Judge Marchese was, therefore, prejudiced against her.

¶ 53    Section 2-1001(a)(3) of the Code provides for a substitution of judge for cause. 735 ILCS 5/2-1001(a)(3) (West 2010). "A trial judge is presumed to be impartial, and the burden is on the party alleging partiality to overcome this presumption. [Citation.] The moving party must establish 'actual prejudice' in a petition seeking substitution of judge for cause, *i.e.*, either prejudicial trial conduct or personal bias. [Citation.]" *In re Joshua S.*, 2012 IL App (2d) 120197, ¶ 41. The trial court is in the best position to determine whether it has become prejudiced, and its determination will not be reversed unless against the manifest weight of the evidence. *Id.*

¶ 54    The trial court's ruling on Eric's motion to enroll E.L. in kindergarten in Glen Ellyn was hardly a harbinger of things to come. The trial court considered that E.L. was living with Linda in a rented apartment in Wheaton while Eric was living in the marital home in Glen Ellyn that he had owned for 20 years and in which E.L. had lived for the first 5 years of his life. At the time the motion was heard, the school year was approaching and E.L. was to begin attending kindergarten. A trial that would determine the issue of custody, in addition to other issues the parties could not resolve, was scheduled for mid-October. While the child's adjustment to his home, school, and community is one of the relevant factors under the Act, there are several other relevant factors as well, and the record reflects that the issue of custody was vigorously litigated at trial, with the trial court hearing several days of testimony and considering numerous exhibits.

¶ 55    This court has stated:

"Moreover, the alleged bias or prejudice of a trial judge to be disqualifying must be shown to have stemmed from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. [Citation.] *** [A]lleged erroneous rulings and findings made by the trial judge in the course of the trial *** are not in themselves sufficient reasons to believe that the judge had a personal bias or prejudice for or against him [citations] ***." *In re Marriage of Santa Cruz*, 179 Ill. App. 3d 611, 622-23 (1989).

We are confident that the trial court gave the issue of child custody the utmost consideration without input from an extrajudicial source.

¶ 56   We conclude that Judge Anderson's determination that Judge Marchese's decision did not indicate actual prejudice is not against the manifest weight of the evidence, and we will not reverse it.

¶ 57                    E. Eric's Cross-appeal Regarding Attorney Fees

¶ 58   Eric cross-appeals the award of $120,000 in attorney fees for Linda's attorneys. We review for an abuse of discretion a trial court's award of attorney fees under section 508(a) of the Act (750 ILCS 5/508(a) (West 2010)). *In re Marriage of Sobieski*, 2013 IL App (2d) 111146, ¶ 37.

¶ 59   Section 508(a) of the Act states:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. *** At the conclusion of [the case], contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 ***." 750 ILCS 5/508(a) (West 2010).

Section 503(j)(2) provides: "Any award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2010). In turn, section 504 lists the following factors:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

-12-

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2010).

¶ 60    The Act allows the trial court to order one party to contribute to the other's attorney fees where one party lacks the financial resources to pay them and the other party has the ability to pay. *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005). The party seeking contribution must establish his or her inability to pay and the other spouse's ability to do so. *Id.* Inability to pay exists where the payment of attorney fees would strip the party of his or her means of support or would undermine his or her financial stability. *Id.*

¶ 61    Eric first argues that the trial court lacked authority to award a contribution for attorney fees that required payment from the nonmarital assets that had been assigned to him. Eric admits that a trial court is to consider the factors contained in section 504 regarding maintenance when determining whether to award a contribution for attorney fees. Section 504(a)(1) lists as a relevant factor "the income and property *of each party*, including marital property apportioned and non-marital property assigned to the party seeking maintenance." (Emphasis added.) 750 ILCS 5/504(a)(1) (West 2010). Eric interprets this language as granting the trial court "authority only to consider the non-marital property assigned to the party seeking maintenance not the non-marital property assigned to the spouse who may be obligated to pay maintenance when considering a request for attorney fees." This argument lacks merit and borders on frivolity, as it disregards and redacts the word "each" from the statute. Section 504(a)(1) allows consideration of "the income and property of *each party*" (emphasis added), not just the party seeking maintenance or contribution. No property of either party is excluded.

¶ 62    Eric correctly points out that this court observed in *In re Marriage of DeLarco*, 313 Ill. App. 3d 107 (2000), that the legislative goal was to level the playing field by equalizing the parties' litigation resources. *DeLarco* held that "[t]he 'equalization' factor of section 501(c-1) applies only to attorney fees and costs awarded during the period while the litigation is pending," because interim fees may be deemed ultimately to have been advances from the parties' marital estate. *Id.* at 113. However, nothing in the Act requires the trial court to "equalize" fees in a contribution hearing. *Id.* Eric posits that "the trial court may have considered the affidavit regarding Eric's payment of attorney fees and believed incorrectly that the trial court was required to equalize fees" in order to "level the playing field." This is sheer speculation and misplaced reliance on *DeLarco*. We agree with Linda that the trial court properly considered the disparity between the parties' incomes and education, and the parties' agreement that Linda would be a stay-at-home mother and E.L.'s primary caretaker.

¶ 63    Eric also argues that the trial court erred in ordering him to pay the $120,000 in attorney

fees within 30 days of the entry of the judgment. According to Eric, the trial court lacked authority to require payment within a specified period. We would find this to be an interesting question had the trial court actually so ordered. However, Eric provides no citation to the record where the trial court required that the payment be made within 30 days. The trial court's April 11, 2012, judgment for dissolution merely stated, "Eric Lonvick shall pay the sum of $120,000 as and for a contribution to Mrs. Lonvick's attorney's fees to Botti Law Firm, P.C." This argument lacks merit.

¶ 64        Accordingly, we determine that the trial court did not err in finding that Linda could not pay her own fees and that Eric had the ability to contribute to Linda's fees. Thus, considering the totality of the record, we conclude that the grant of Linda's petition for contribution was not an abuse of discretion.

¶ 65                                    III. CONCLUSION
¶ 66        For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 67        Affirmed.