2023 IL App (2d) 220284-U
No. 2-22-0284
Order filed January 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF DANIEL BARNETT, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) | No. 15-D-390 |
| | ) | |
| AMBER BARNETT, | ) ) | Honorable Ari P. Fisz, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying father's motion for sole parental decision-making authority or in granting father's motion to modify parenting time and name him primary residential custodian for school purposes.

¶ 2    The respondent, Amber Barnett, appeals from the trial court's order granting, in part, the petition to modify parental decision-making responsibility and parenting time filed by the petitioner, Daniel Barnett. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On February 13, 2012, B.B., the minor, was born to the parties. The parties subsequently married in July 2012. In June 2016, the parties divorced. The judgment of dissolution incorporated a joint parenting agreement and a final custody judgment. The parties shared joint legal custody of the minor and Amber was named primary residential parent. Daniel was granted visitation every other weekend, for several hours on Tuesdays, and several hours on the Thursdays preceding weekends when Daniel would not have parenting time.

¶ 5    On September 4, 2019, Daniel filed a motion to modify the custody judgment. Daniel stated that, since about July 2018, the parties had agreed to and followed a parenting time schedule that was different from that set forth in the original custody judgment. Specifically, Daniel had been exercising visitation on Tuesdays from after school until drop off at school Wednesday morning, his weekend visitation commenced on Friday after school until drop off at school Monday morning, and every other Thursday after school until drop off at school Friday morning. Daniel requested modification of the custody judgment to reflect the parties' current visitation schedule.

¶ 6    On February 20, 2020, the parties entered an agreed order. The agreed order modified the parenting schedule as follows. Daniel was granted visitation: on Tuesdays and every other Thursday from after school until drop off at school the next morning; every other weekend from after school on Friday until Sunday at 6:30 p.m. during the school year and until Monday 8 a.m. during the summer; and one week of uninterrupted visitation during the summer.

¶ 7    On March 10, 2022, Daniel filed a motion to modify parenting time and parental decision-making responsibilities. In the motion, Daniel asserted that it was in the minor's best interest to modify the parenting schedule because Amber had become inconsistent and unreliable. Daniel alleged that, in July 2020, Amber moved to live with a boyfriend, Ryan, in McHenry County. That

relationship ended in February 2021 and then Amber went on a vacation with another man, Tony, in March 2021. Thereafter she and the minor began spending a significant amount of time with Tony in his one-bedroom Chicago condominium. In January 2022, Amber and the minor moved into a residence with Tony in Elgin, requiring the minor to endure a 40-minute drive to school each way and often being tardy to school. Daniel alleged that Amber had moved with the minor to four different residences in a 36-month time period. Daniel asserted that these facts were sufficient to establish a substantial change in circumstances. Daniel argued that it was in the minor's best interest for Daniel to be named the primary residential parent for school purposes and for him to have sole parental decision-making responsibility.

¶ 8    On May 18, 2022, Daniel filed a motion to appoint a guardian *ad litem* (GAL), arguing that it was in the minor's best interest and would assist the parties in the litigation. About a week later, the trial court appointed Jenny Valsamas as the GAL to represent the minor in this litigation.

¶ 9    On June 21, 2022, Daniel filed an emergency petition for preliminary injunction and temporary restraining order. Daniel noted that the minor had always attended school in Barrington but Amber had recently enrolled the minor in the Elgin school district. Daniel requested that Amber be ordered to enroll the minor in the Barrington school district and that she be restrained from moving the minor outside of Barrington. On July 6, 2022, the trial court entered an order providing that, "without prejudice to a full hearing on the issue *** the parties may enroll the minor child in the Lake Zurich and Barrington school districts for the 2022-2023 academic year." The trial court set July 15, 2022, for hearing on Daniel's emergency petition and motion to modify parenting time.

¶ 10    On July 8, 2022, Amber filed a motion to substitute attorneys. On July 12, 2022, Amber filed a motion for a professional custody evaluation under section 604.10(b) of the Illinois

Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2020)), a motion for an *in camera* interview of the minor, and a motion for Daniel to be drug tested (alleging Daniel abused steroids and cocaine). Amber also filed a motion to continue the July 15, 2022, hearing date, so that her new attorney would have adequate time to prepare. She also noted that the GAL had not filed a written report and would need time to investigate Amber's new allegations.

¶ 11     On July 15, 2022, the trial court granted Amber's motion to substitute attorneys. Amber requested a continuance on the basis that her new attorney had only been on the case about a week, there was no discovery or depositions, and the GAL had not filed a written report. Further, she had filed a motion for an *in camera* interview and a for a 604 evaluation, and her attorney would need time to adequately prepare for a hearing. Amber requested a 60-to-90-day continuance and, in the meantime, the minor could attend school in Barrington. Daniel argued that a motion to continue was inappropriate, he had filed his petition in March, and the trial court had previously stated that the GAL did not need to issue a written report. The trial court denied the motion to continue. The trial court acknowledged that Amber had a new attorney but stated that it was her decision to change lawyers. Further, the trial court stated that the matter was a time sensitive issue and that, due to its and the GAL's schedule, this was the last time the trial court could address the issue before school started. Thereafter, a three-day hearing commenced.

¶ 12                                A. GAL's Testimony

¶ 13     Valsamas testified that, as part of her investigation, she spoke to Amber, Daniel, both of their fiancés (Tony and Kelly), Daniel's brother and father, Amber's mother, her mother's boyfriend Rob, and one of Amber's friends. She also visited with the minor in her office and at Daniel's home. Daniel had requested a home visit but Amber did not. Valsamas did the best investigation that she could in light of the time restrictions. She would have liked to have spoken

to the minor's fourth grade teacher, but the teacher was off for the summer and could not be reached. Valsamas recommended that the minor be enrolled in the Lake Zurich school district and, as a result, that the minor have increased parenting time with Daniel. Valsamas acknowledged it was not an easy decision.

¶ 14    Valsamas testified that, from discussions with Amber, she learned that, in 2019, Amber had a relationship with someone who lived in Lake Barrington (Marshall), and Amber and the minor lived with that person. When that relationship ended, Amber moved back to her Barrington home. Around July 2020, Amber started dating someone who lived in McHenry (Ryan) and Amber and the minor spent quite a bit of time at that person's home during the COVID lockdowns and remote learning. That relationship ended in January 2021 and Amber and the minor moved back to Amber's Barrington home. Amber started dating her fiancé, Tony, in April 2021 and then she and the minor moved to Elgin in February 2022 to live with Tony. These circumstances concerned Valsamas because this was a lot of movement for the minor and the minor established relationships with these men and then the relationships were ended.

¶ 15    Valsamas further testified that she did not speak with the minor about moving to different homes or her mother's relationships. She focused on getting to know the minor. The minor had some difficulty in the Barrington school district toward the end of the most recent school year. The minor said it might be fun to go to school in Lake Zurich and that she had friends in her Dad's neighborhood. However, in another conversation, when Amber brought the minor in, the minor said that going to school in Barrington would be fun and that her maternal grandmother promised to buy her a horse.

¶ 16    Valsamas testified that, when she first spoke with Amber in June 2022, Amber stated that she wanted the minor to attend school in Elgin, that the Barrington school district was not a good

fit for the minor, and that the minor had expressed interest in a change. Amber did not know the name of the Elgin school so Valsamas asked her to find out and email her the name of the school. Amber sent a follow up email with the name of the school in Elgin and an explanation of why she thought it best for the minor to attend school in Elgin. However, a week later, after the July 6th hearing, Amber sent Valsamas an email explaining that the minor should be going to school in Barrington. The fact that Amber had named two different schools within a week's time was concerning. Valsamas said that she sent an email to Amber asking why Barrington was now the preferred school district but Amber never responded.

¶ 17    On cross-examination, Valsamas testified that the minor was an excellent student and that her report cards did not indicate that the minor was excessively absent or tardy. Valsamas reiterated that she had been unable to speak with the minor's teacher. Valsamas acknowledged that there were certain statutory factors to be considered in a modification proceeding and testified that she had considered all the factors. Valsamas acknowledged that cohabitation, although it was a factor that could be considered, could not be the sole basis for a change of custody. Valsamas stated that her primary considerations in making her determination were Amber's inconsistent living arrangements, Amber's flip-flopping over which school district was best for the minor, and the neighborhood and environment where Daniel lived in Lake Zurich. Valsamas admitted that Amber's mother told her that when Amber and Daniel were together Daniel was taking steroids and Amber was the one providing them.

¶ 18    On redirect-examination, Valsamas testified that, during her investigation, Amber never raised concerns about Daniel's alleged drug use. Valsamas also stated that Daniel told her that Tony was convicted on drug related charges in 2010 and spent time in prison. On recross-examination, Valsamas testified that Tony told her that he had spent time in a penitentiary in

California and that he was released in early 2021 and was on parole for five years. Tony said he had been clean and was hoping to be released from parole early.

¶ 19                              B. Daniel's Testimony

¶ 20    Daniel testified that he lived in Lake Zurich. He believed that having the minor attend school in Lake Zurich would be in her best interest because there would be little likelihood that she would have to change school districts and his neighborhood's elementary school had an excellent reputation. Daniel testified that at the end of previous school year in Barrington, the minor experienced an issue with being bullied. Daniel testified that the minor had more and stronger friendships in Lake Zurich than in Barrington. Daniel said that he would like to be primary residential parent so that the minor could have a consistent school community for the rest of her childhood and through high school. He would like half or more of parenting time, depending on where Amber was residing.

¶ 21    Daniel testified that he wanted sole decision-making responsibility because that responsibility had two components: determining what was best for the minor and what could improve relations with both parents. He did not believe that Amber operated with these goals in mind. Daniel testified that he believed the minor enjoyed living with him because she had a place of stability in her life where she could establish long term friendships and a sense of community. Daniel stated that he lived with his fiancée Kelly. She was a licensed clinical social worker. Kelly and the minor had a strong relationship because Kelly had been in the minor's life since the minor was three years old. He had been dating Kelly for over seven years and they were getting married in September 2022.

¶ 22    Daniel testified that he had enrolled the minor in extracurricular activities such as softball and orchestra. He always discussed it with Amber before he registered the minor for anything.

He attended most of the minor's extracurricular events. He missed four softball games because he was out of town. His parents attended pretty much every game. Amber only attended about half the softball games in the summer of 2021. However, she attended more of the minor's games in the summer of 2022 after he filed his motion to modify custody. Daniel testified that when he would bring the minor for parenting exchanges, half the time Tony was present and not Amber. The minor told him that Tony often drove her to school and picked her up. The minor was late for school on multiple occasions. Although her report card only indicated the minor was tardy three times, Daniel testified that the minor was actually tardy more often than that. Daniel testified that he did not do drugs.

¶ 23                    C. Amber's Testimony

¶ 24    Amber testified as an adverse witness that, after the divorce in 2016, she moved into a small house in Barrington. In February 2022, she and the minor began living with Tony in Elgin. She was pregnant at the time. The commute to the minor's school in Barrington was about 30 minutes each way and it did not bother the minor. Amber stated that the minor was only tardy a couple of times and that it was marked on the minor's report card. Amber admitted that the minor developed relationships with each of her boyfriends but said that the break-ups did not seem to bother the minor. Amber admitted that there were one or two times that Daniel showed up at her house at 6:30 p.m. on a Sunday to drop the minor off and Amber was not at home. Amber testified that the reason she considered enrolling the minor in the Elgin school district was because Daniel told her it was illegal to live in Elgin and attend school in Barrington, and also because the minor expressed interest in going to school in Elgin. She ultimately decided against having the minor attend school in Elgin because the trial court told her it was not an option.

¶ 25    Amber testified on her own behalf that, at the end of 2015, she started dating Marshall and that relationship lasted about four years. In December 2018, she and the minor began living with him in Lake Barrington. The minor got along well with Marshall and his house was close enough that the minor did not need to change schools. The relationship ended in April 2019, when she realized Marshall had a substance abuse problem. She and the minor moved back to her home in Barrington. In the summer of 2019, she started dating someone named Ryan. She never moved in with him but she and the minor quarantined at his home in McHenry during the pandemic. She broke up with Ryan in January 2021. She started dating her fiancé Tony in the summer of 2021. She moved to Elgin to live with him in February 2022, after they were engaged. She did not attempt to have the minor change schools. Amber testified that the minor was happy in the Barrington school district and that she should continue to attend school in Barrington. She acknowledged that, at the Barrington school, there was a bullying incident where the minor received a nasty letter from another student. The minor handled it well and Amber did not think there would be any other issues. Amber testified that the minor had a lot of friends at the Barrington school and often had play dates with these friends. The minor also liked her teachers at the Barrington school.

¶ 26    Amber acknowledged that the minor's fourth grade report card indicated that the minor was tardy on three occasions. She did not remember any additional times that the minor was tardy. She took the minor to school on most days. Amber believed that she had a close relationship with the minor and that they had open lines of communication. The minor was currently on a softball team. Amber went to most of the minor's games but had missed two games due to other commitments. The minor was also taking horseback riding lessons on Wednesdays in Elgin. Amber transported the minor to the lessons during her parenting time. Amber testified that she

had generally taken the minor for doctor appointments, but Daniel had taken the minor on one occasion. Daniel normally accompanied the minor to the dentist.

¶ 27 Amber testified that she was moving to a new house in Barrington that was bigger. The record indicates that the home was purchased by Amber's mother and was owned by her mother's real estate company. The record also indicates that Amber and Tony had a baby girl together and were married in November 2022. Amber testified that she only had one meeting with the GAL. It was via Zoom and only lasted about an hour. Amber would have liked more time to speak with the GAL. The GAL never came to her home or observed her interact with the minor. Amber testified that, prior to speaking with the GAL, she filled out an intake form. She indicated on the form that she had concerns with Daniel's alleged drug and alcohol use. The GAL never asked her about this concern or why it was marked on the intake form. Amber testified she was concerned that Daniel was using steroids because of "his personality, arguing, aggressiveness." The minor told Amber that she was scared to share things with Daniel because of it. When asked why she did not bring this concern to the attention of the GAL, Amber testified that the first meeting was mostly the GAL asking her questions and she thought she would be speaking with the GAL on more than one occasion.

¶ 28 Amber testified that she had been very involved at the Barrington school. She had been there for Halloween parades, helped with holiday parties, volunteered to be math mom, and was a surprise reader. Amber testified that it would be helpful for the trial court to speak directly to the minor and that the minor would not find it traumatic. Amber said that the minor really wanted to continue going to school in Barrington and to keep things the way they were. Amber testified that the minor had a good relationship with her family. Amber's mother, the minor's grandmother, enjoyed spending time with the minor. Amber's brother had three children that live in Barrington

and the minor spends time with them. Tony got along well with the minor. He took her fishing, to batting cages, he built a lemonade stand with her, and they rode four-wheelers together.

¶ 29 On cross-examination, Amber testified that she had three relationships since her divorce from Daniel: Marshall, Ryan, and Tony. Amber identified a photo of the minor out to lunch with her and a person named Max. Amber testified that Max was the son of Kevin, someone she casually dated prior to the divorce being finalized. After Kevin, she dated someone named Carl for a short time. Amber did not remember the minor sleeping over at Carl's house. Amber also testified that she could not remember if the minor ever slept over at Marshall's house. Amber acknowledged that she also had a relationship with someone named Christopher. She dated him for a short time in 2017 when Marshall had temporarily moved to Arizona. Amber identified a picture of a dog, stated it was Christopher's dog, and denied that she helped purchase the dog. The minor had been around the dog but Amber denied telling the minor that the dog was hers. Amber did not recall the minor being upset when she broke up with Christopher and the dog was no longer around. Amber acknowledged that Marshall had purchased a lizard for the minor and that Marshall gave the lizard away when they broke up. Amber stated that the minor would have liked to have kept the lizard but Amber did not know how to care for it.

¶ 30 Amber acknowledged that in 2017, a friend of hers and the friend's daughter moved in with her and the minor for a short period while her friend was going through a breakup. The minor occasionally shared her room with the friend's child. Amber acknowledged that, when she was living with Marshall, she had considered switching the minor to attend school in Lake Barrington. She ultimately decided against it because she did not think it was best for the minor. Amber testified that she started dating Tony in 2020, after he was released from prison. She stated that she, Tony, and the minor have gone four-wheeling. Amber identified a photo of a trip she took to

Tennessee. It was dated February 21, 2019, and it showed Amber in the driver's seat of a four-wheeler with a seatbelt on and holding a can of beer. Amber testified that she was not operating the four-wheeler and did not operate it after drinking. Amber identified a photo of her on a boat with her girlfriends and there was an alcoholic beverage in the driver's cup holder. Amber testified that it belonged to someone else and it was the only cup holder on the boat. She adamantly testified that she would never drink while operating a boat.

¶ 31 Amber testified that she only mentioned the minor going to school in Elgin was because everyone was telling her it was illegal to live in Elgin and go to school in Barrington. Also, the minor had expressed interest in going to school in Elgin. She did not tell the GAL that she wanted the minor to go to school in Elgin, rather she told her that the minor had to go to school in Elgin because she was living in Elgin. Amber testified that she never refused to enroll the minor in the Barrington school district. She then testified that, when she spoke to the GAL, she advocated for the Elgin school district because she thought "Barrington was illegal" and she wanted to stay with her child. Finally, Amber testified that even though she was moving to a different home in Barrington, the minor could still attend the same elementary school because the school district considered her grandfathered in at the existing school.

¶ 32                          D. Trial Court's Ruling

¶ 33 Following closing arguments, the trial court rendered its ruling. The trial court stated that it considered the relevant statute and all the relevant elements that it was required to consider. The trial court also stated that it was going "to mention some of the parts of the reasoning for my ruling, but not all of them." The trial court first addressed Amber's motion for a 604.10(b) evaluator and her motion for an *in camera* interview with the minor. The trial court denied those motions, stating that it did not need such assistance to make a ruling. The trial court also denied Amber's motion

to have Daniel submit to drug testing, finding that there was no evidence that any drug use by Daniel recently occurred.

¶ 34 The trial court denied Daniel's request for sole decision-making power. The trial court found that the evidence indicated that the parties seemed to work reasonably well together as it related to the minor.

¶ 35 The trial court then addressed the issue of where the minor should attend school and how that should affect parenting time. The trial court noted that the GAL recommended that the minor attend school in Lake Zurich and that Daniel have increased parenting time as a result. The GAL also stated that the minor knew children in the Lake Zurich school district and that the minor was not opposed to attending school in Lake Zurich. The trial court stated that it considered that the evidence showed that Amber had once considered moving the minor to a different school district in Lake Barrington and also to a school district in Elgin.

¶ 36 The trial court noted that it was tasked with determining whether there had been a substantial change in circumstances since the entry of the parenting plan in February 2020 that made a modification necessary to serve the best interests of the minor. The trial court noted that, prior to February 2020 Amber had dated several men casually, but seriously dated Marshall. Since February 2020, Amber had seriously dated Ryan and her now fiancé Tony. In early 2020, Amber and the minor moved in with Ryan during quarantine. In the fall of 2020 Amber and the minor moved back to Barrington and Amber ended the relationship with Ryan in January 2021. Later in 2021, Amber started dating Tony and then she and the minor moved in with him in Elgin in February 2022. The trial court noted that, because it had found Elgin was an inappropriate school district for the minor, Amber was moving the minor and herself back to Barrington.

¶ 37    The trial court noted that in addition to Marshall, Ryan and Tony, Amber had also dated Kevin, Carl, and Christopher. All these men were part of the minor's life to some extent, she had spent time with their children and had lived with some of them. The trial court acknowledged that it could not say whether any of them had a particularly positive or negative effect on the minor but found that the situation subjected the minor to a lot of instability. Specifically, since February 2020, Ryan had been in and out of the minor's life and now Tony was in her life. The trial court concluded that, based on the foregoing, there had been a substantial change in circumstances after February 2020.

¶ 38    The trial court then considered whether a modification to the parenting schedule was in the best interest of the minor. As a preliminary matter, the trial court made two findings. First, the trial court found that it was not in the minor's best interest to have been commuting to her Barrington school from Elgin. Second, the trial court found that Amber's testimony was not credible. The trial court noted Amber's testimony, relative to the picture where Amber was holding a beer in the driver's seat of a four-wheeler, that she entered the vehicle just to take the photo. The trial court found that, if Amber had entered the vehicle just for the photo, it was unlikely that she would have put a seat belt on. The trial court also stated that there were various instances when Amber's testimony was not consistent. For example, she testified that she could not remember if she and the minor ever slept over at Marshall's house but then later testified that she and the minor lived with Marshall for a period of time. The trial court concluded that the instability in the minor's life, and the men in and out of her life since February 2020, had resulted in a substantial change in circumstances and that a modification of custody was in the minor's best interest. The trial court designated Daniel as the primary residential parent for school purposes and ordered that the minor attend school in Lake Zurich. The trial court modified the parenting

time to a 50/50 schedule and ordered the parties to determine what that schedule would look like. The trial court stated that if the parties could not reach an agreement, then it would determine an appropriate parenting schedule. The trial court noted that its ruling assumed that Amber was moving back to Barrington as she testified to at the hearing. Based on its ruling, the trial court found that Daniel's emergency petition for preliminary injunction was rendered moot.

¶ 39    On August 9, 2022, the trial court approved the parties' agreed 50/50 parenting schedule and denied Amber's motion for a stay of the school enforcement order pending her appeal. The trial court noted that the GAL recommended that the minor attend school in Lake Zurich and, in discussions with the GAL, the minor responded positively to the possibility of attending school in Lake Zurich. The trial court noted that Amber had considered removing the minor from the Barrington school district when she lived with Marshall and when she moved to Elgin with Tony. The trial court found that Amber's assertion that it would not be in the best interest of the minor to be removed from the Barrington school district was disingenuous and inconsistent with Amber's previous thoughts on the matter. The trial court also found that a denial of the motion for a stay was in the best interest of the minor. This timely appeal followed.

¶ 40                                II. ANALYSIS

¶ 41                        A. Substantial Change in Circumstances

¶ 42    Amber's first contention on appeal is that the trial court's order, finding a substantial change in circumstances, was against the manifest weight of the evidence. Section 610.5 of the Act authorizes the filing of motions to modify a plan or judgment allocating parental decision-making responsibilities and parenting time. 750 ILCS 5/610.5 (West 2018). Relevant here, section 610.5(c) of the Act provides:

"Except in a case concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2018).

¶ 43 Thus, resolution of a custody-modification motion involves a two-step process. The court must first determine whether the movant has established, by a preponderance of the evidence, a substantial change in circumstances based on facts that have arisen since the entry of the existing parenting plan or facts that were not anticipated when the existing parenting judgment was entered. 750 ILCS 5/610.5(c) (West 2018); *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 26. If the movant has not met his or her burden of showing a substantial change in circumstances, then the court must deny the modification petition. If the movant has met his or her burden of showing a substantial change in circumstances, the court addresses whether modification is necessary to serve the child's best interests. *Id.*

¶ 44 A trial court's determination concerning parental responsibilities and custody, including custody modification, is given great deference because the trial court is in a superior position to judge witness credibility, resolve conflicts in the evidence, and determine the best interests of the child. *In re Marriage of Lonvik*, 2013 IL App (2d) 120865, ¶ 33. To the extent that the trial court did not expressly so find, we presume that it made findings consistent with its judgment. *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill. App. 3d 585, 586 (2008). We will not reverse the trial court's judgment unless it is clearly against the manifest weight of the evidence, that is,

only when the opposite conclusion is clearly evident. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. Where the evidence permits multiple inferences, we will accept those inferences that support the trial court's order. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). Reviewing courts are not permitted to try child custody cases *de novo*. *In re Custody of Sussenbach*, 108 Ill. 2d 489, 499 (1985). In order to reverse the trial court's judgment it is not enough to show that the record would support a contrary decision, "[r]ather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *King Koil Licensing Co. v. Harris*, 2017 IL App (1st) 161019, ¶ 59. However, the court's discretion is not unlimited, and when a custody determination is contrary to the manifest weight of the evidence, it is the duty of the reviewing court to reverse that decision. *In re Marriage of Bush*, 170 Ill. App. 3d 523, 529 (1988).

¶ 45    In the present case, the trial court's finding of a substantial change in circumstances was not against the manifest weight of the evidence. The trial court's determination was based primarily on a finding of instability in the minor's life. The trial court noted that, since February 2020, the minor had moved with Amber into Ryan's home during quarantine. After the breakup, they moved back to Barrington. A short time later, Amber started dating Tony and Amber and the minor occasionally stayed with him in his one-bedroom condo in Chicago. They then moved with Tony to a home in Elgin and the minor was commuting to school in Barrington. The trial court also commented that, prior to February 2020, Amber and the minor had lived with another boyfriend, Marshall, and that Amber had dated Kevin, Carl, and Christopher. The minor developed relationships with these men, and in some cases their pets, and then they were removed from her life. It cannot be denied that frequent moves and changing relationships can be emotionally unnerving, even if the effects do not always outwardly and immediately manifest themselves in negative behavior or academic struggle. We emphasize that the question before us

on appeal is not whether we could have come to a different determination had we been in the role of the trial court; the question is whether the trial court's determination is against the manifest weight of the evidence. Based on the record before us and bound by our standard of review, we answer this question in the negative.

¶ 46    Amber argues that it was improper for the trial court to consider anything that happened prior to the last custody order in February 2020. In other words, she argues that the trial court erred in commenting on her living arrangements with Marshall, and that she dated Kevin, Carl, and Christopher. We agree that, generally, a trial court should determine whether there has been a substantial change in circumstances based on facts that have arisen since the entry of an existing parenting plan. See 750 ILCS 5/610.5(c) (West 2020). The trial court specifically stated that it only considered circumstances that occurred since the February 2020 agreed order. Nonetheless, to the extent the trial court considered circumstances prior to February 2020, we note that it is not necessarily improper for a trial court to consider facts existing at the time of an earlier decree but not known to the court at that time in ruling on a petition to modify custody if those facts are relevant and material. See *Valencia v. Valencia*, 71 Ill. 2d 220, 226 (1978); *In re Marriage of Kleibocker*, 262 Ill. App. 3d 644, 645 (1994). Here, the evidence at issue was relevant to whether the conduct after February 2020 could be a basis for a finding of instability. Further, the February 2020 agreed order was the result of mediation between the parties, a change in residential custody for school purposes was not at issue, and, therefore, the contested evidence was not made known to the court at that time.

¶ 47    In arguing that the evidence was improperly considered, Amber cites to *In re Marriage of Connors*, 303 Ill. App. 3d 219 (1999), where this court stated that "[c]ourts in modification proceedings allow the parties to present only the evidence going back to the latest petition for

modification in order to avoid the relitigation of matters already settled." Amber's reliance on *Connors* is unpersuasive. First, *Connors* involved a modification of maintenance, which is not at issue in this case. Second, as explained above, the consideration of the contested evidence did not amount to a relitigation of matters previously addressed because none of the evidence was brought to the trial court's attention at the time of the February 2020 agreed order.

¶ 48                                B. Best Interest of the Minor

¶ 49    Amber next argues that the trial court erred in finding that modification was necessary to serve the best interest of the minor. A trial court has the authority to modify a parenting plan if it is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2020). That is, a change in circumstances, by itself, is not sufficient to justify a modification of custody; rather, the change in circumstances must affect the welfare of the child. *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 344 (1992). Section 602.7(b) of the Act sets forth a list of factors that a trial court can consider in determining an allocation of parenting time that it is the best interest of the child. 750 ILCS 5/602.7(b) (West 2018). "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. We will reverse a best-interests finding only when it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 50    The trial court's determination that modification was necessary to serve the minor's best interest was not against the manifest weight of the evidence. The stability of the minor's environment is an important factor in determining a child's best interest. *In re Marriage of Dunn*, 208 Ill. App. 3d 1033, 1041 (1991). The trial court noted that Amber's boyfriends, who had come in and out of the minor's life, the frequent moves, and that Amber had considered changing the

minor's school district on more than one occasion was "not something that the Court would describe as stable." On the other hand, the evidence showed that Daniel had been in the same relationship for six years and had never moved. Amber's home life was unstable when compared to the environment provided by Daniel. It is well settled that "the ill effects of a custodial parent's changes in residence need not manifest themselves before a court can alter a child's custody." *Id.*

¶ 51 Amber argues that the trial court failed to consider all the statutory best interest factors. However, the trial court specifically stated that it considered all the requisite statutory factors and, as noted above, a trial court is not required to make specific factual findings as to each factor. *Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. "Generally, we presume that a trial court knows the law and follows it accordingly." *Id.* "A petitioner's mere assertion that the trial court did not consider the statutory factors is insufficient to overcome the presumption that the trial court knew and followed the law." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 16. Thus, this claim by Amber is without merit.

¶ 52 Amber cites multiple cases in support of her assertion that the trial court's determination should be reversed. However, it is well settled that custody cases are *sui generis* and must be judged on their own particular facts. See *In re Parentage of Scarlett Z.-D.*, 2014 IL App (2d) 120266-B, ¶ 65. Further, none of these cases are persuasive as there are significant factual dissimilarities. For example, Amber cites to *In re Marriage of Hefer*, 282 Ill. App. 3d 73 (1996). In that case, while the mother was awarded temporary custody of the parties' two children during the pendency of divorce proceedings, the trial court ultimately awarded permanent custody to the father. *Id.* at 74-75. The reviewing court reversed that custody award and remanded for reconsideration because the trial court heavily relied on the children's wishes expressed in an *in camera* interview, there was some evidence of an attempt to manipulate the children's parental

preference, and the mother had served as the primary caretaker for about four years prior to the permanent custody award. *Id.* at 79-80. Further, the year prior to the permanent custody award, the father moved to a different state and had not regularly exercised visitation with the children. *Id.* at 80. Amber argues that *Hefer* supports a custody award in her favor because she was the primary caretaker of the minor. However, unlike the father in *Hefer*, Daniel had joint custody, exercised his visitation regularly, and did not move out of state. The other cases cited by Amber are similarly inapt or unpersuasive. See *In re Marriage of Leopando*, 106 Ill. App. 3d 444 (1982) (custody award in favor of father reversed where evidence showed that the father had very little involvement in the child's life); *Hall v. Hall*, 226 Ill. App. 3d 686 (1992) (sole custody in favor of father reversed and remanded for reconsideration where child had spent most of her life in her mother's care; reviewing court recommended the trial court seriously consider a joint custody award); *In re Marriage of Stuart*, 141 Ill. App. 3d 314, 322 (1986) (reviewing court affirmed trial court's amended judgment granting custody of children to mother because she had always been primary caretaker while father worked long hours and had been separated from his children for protracted periods of time).

¶ 53    Amber argues that the trial court's decision was improper because the Act "creates a presumption in favor of the present custodial arrangement which should not be lightly overturned." *In re Marriage of R.S.*, 286 Ill. App. 3d 1046, 1051 (1996). However, "[t]he purpose of this presumption is to promote stability and continuity in the child's custodial and environmental relationships." Here, the trial court's determination did not violate the presumption as it was specifically based on finding the most stable environment for the minor. The trial court found that the frequent moves, changing relationships, and Amber's consideration of changing school districts on two occasions was detrimental to the minor's stability and continuity of custodial and

environmental relationships. The trial court has the opportunity to observe the parties and is in the best position to evaluate the situation with a view to what is in the child's best interests. *Lonvik*, 2013 IL App (2d) 120865, ¶ 33.

¶ 54 Amber further argues that the trial court erred in accepting the GAL's recommendation. A GAL is the "eyes and the ears" of the court and the trial court should consider and give some weight to a GAL's recommendations. *In re Marriage of Wycoff*, 266 Ill. App. 408, 415-16 (1994). The trial court, however, is not bound by a GAL's recommendations. *Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974). Here, the trial court was free to accept or reject some or all of the GAL's advice. Amber also argues that, because the GAL did not issue a written report, it is unclear whether she considered all the statutory factors. However, the trial court noted in its ruling that, at an earlier hearing, it determined that a written report was not required and that there was no objection. Although Amber argues that the GAL did not consider all the statutory factors, the GAL specifically testified that she did consider all the statutory factors. Further, the GAL was subject to cross-examination where Amber had the opportunity to highlight any shortcomings in the GAL's investigation.

¶ 55 Finally, Amber argues that the trial court erred in awarding equal parenting time. "[T]he Act requires a court to allocate parenting time in accordance with the best interest of the child." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 14. The Act neither mandates nor precludes equal parenting time in a joint custody situation. *In re Marriage of Perez*, 2015 IL App (3d) 140876, ¶ 27. Some courts have viewed a 50/50 joint parenting schedule with disfavor, and when "the parents had too much animosity to be able to cooperate, 50/50 arrangements have been set aside." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47 (citing cases). On the other hand, "where the record shows that the parties are reasonably loving and capable parents who are

sufficiently able to cooperate even though each party attempted to prove the other was less capable, the 50/50 arrangement could be upheld." *Id.* (citing, in part, *Perez*, 2015 IL App (3d) 140876, ¶ 33 (the parties were cooperative and could reach shared decisions together in the best interest of the child)).

¶ 56 Contrary to Amber's assertion, the trial court's finding that the 50/50 parenting schedule was in the best interest of the minor was not against the manifest weight of the evidence. The parties were generally cooperative, as of the date of trial Amber agreed to live in Barrington within close proximity to Daniel, and the minor was accustomed to sharing time at each parent's house. Similar circumstances were found to support a 50/50 parenting schedule. See *Perez*, 2015 IL App (3d) 140876, ¶ 33. The evidence in this case does not suggest that the trial court acted arbitrarily, or that no other person would have taken the same position that the court did.

¶ 57                    C. Pretrial Motions

¶ 58 Amber's final contention on appeal is that the trial court erred in denying her pretrial motions for a continuance, an *in camera* interview with the minor, a custody evaluation, and for drug testing on Daniel. We review the rulings challenged by Amber for an abuse of discretion. See *In re Marriage of LaRoque*, 2018 IL App (2d) 160973, ¶ 94 (continuances); *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733 (2006) (*in camera* interview); *In re Marriage of Slavenas*, 139 Ill. App. 3d 581, 586 (1985) (604 evaluation); *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 32 (evidentiary rulings). Abuse of discretion is the most deferential standard of review, next to no review at all. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 30. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, unreasonable, or where no reasonable person would agree with the position taken by the trial court. *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251, ¶ 38. With these principles in mind, we turn to Amber's arguments.

¶ 59 Litigants do not have an absolute right to a continuance. *LaRoque*, 2018 IL App (2d) 160973, ¶ 94. Here, the trial court evaluated the circumstances surrounding Amber's motion to continue trial. The trial court noted that the issue of custody for school purposes was a time sensitive issue, that Amber had chosen to substitute attorneys at the last minute, and that the court and the GAL would not have another opportunity to address the issue prior to the start of the school year. Given the deferential standard of review on this issue, we cannot say that the trial court's decision was arbitrary, fanciful, unreasonable, or that no reasonable person would agree with the trial court's position.

¶ 60 Section 604.10(a) of the Act states, "The court may interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities." 750 ILCS 5/604.10(a) (West 2018). "A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child." *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733 (2006). "When the trial court determines that good reason exists not to conduct such an interview, a reviewing court will not substitute its judgment for that of the trial judge." *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 544 (1993). Here, the trial court stated that it did not need the assistance of an *in camera* interview with the minor to make a custody determination. The trial court was aware, based on interviews with the GAL, that the minor was not opposed to attending school in Lake Zurich. Based on the record before us, we cannot say that the trial court abused its discretion in denying the motion.

¶ 61 Section 604.10(b) of the Act provides that "[t]he court may seek the advice of any professional, whether or not regularly employed by the court, to assist the court in determining the child's best interests." 750 ILCS 6/604.10(b) (West 2018). In denying Amber's motion for a 604 evaluation, the trial court stated that it did not need a professional evaluation to determine the best

interest of the minor. On appeal, Amber argues only that the trial court erred in denying her motion but does not explain how the trial court erred or provide any basis on which we may reverse the trial court's determination. Amber cites cases for the proposition that the physical and mental condition of the parents is a material issue in custody cases. However, the trial court heard testimony from a GAL and both parents and was in the best position to determine whether a 604 evaluation was necessary. Further, Amber did not question the parties' mental or physical conditions until the eve of trial. We thus find no error in the trial court's denial of Amber's motion.

¶ 62 Finally, we find no abuse of discretion in the trial court's denial of Amber's motion for drug testing. Daniel filed his motion for modification in March but Amber did not file a motion for drug testing until three days before trial. The trial court noted that, at trial, there was no evidence of any recent drug use by Daniel.

¶ 63                     III. CONCLUSION

¶ 64 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 65 Affirmed.