2023 IL App (2d) 220325-U
No. 2-22-0325
Order filed February 10, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* PARENTAGE OF L.C. | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 18-F-28 |
| | ) | |
| | ) | Honorable |
| (Axel C., Petitioner-Appellee, v. | ) | Randie K. Bruno, |
| Jasmin L., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's findings that a substantial change in circumstances had occurred since entry of the allocation judgment and that it was in the child's best interests that primary-parenting time be changed from the mother to the father so the child with special needs could attend a school in the father's school district was not against the manifest weight of the evidence; the mother waived objection to the petition not being considered as a relocation petition.  Affirmed.

¶ 2    At issue in this appeal is whether the trial court erred in finding that a substantial change in circumstances had occurred warranting modification of the allocation judgment and that it was in the child's best interests that primary-parenting time be changed from the mother to the father so the child with special needs could attend a school in the father's school district, and whether the

trial court should have considered the father's petition as one for relocation instead of modification. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Axel Cardenas and Jasmin Lopez, who were never married, are the parents of L.C. who was born on December 5, 2014.  On January 16, 2018, Axel filed a petition for allocation of parental responsibilities seeking sole decision-making responsibility for and primary custody of L.C.  On February 4, 2019, the parties entered an agreed allocation judgment (allocation judgment).  The allocation judgment provided that Axel and Jasmin would jointly share decision-making responsibility for L.C., including decisions related to L.C.'s education, health care, psychological needs, and religion.  The parties agreed that Jasmin would have all parenting time not expressly designated to Axel; Axel would have parenting time every Monday, from 3:30 to 8:30 p.m., and every other weekend, from Friday at 6 p.m. through Sunday at 6 p.m.  Axel would also have parenting time on all school non-attendance days.  The parties would each have two non-consecutive weeks during the summer.  The agreement established a holiday-visitation schedule and emphasized the parties' agreement that flexibility and allowing for family events were in L.C.'s best interests.  The agreement included a right of first refusal wherein the parents agreed that if either parent intended to leave L.C. for a period of four hours or longer during his or her parenting time, other than normal work or school schedules, that parent would offer the other parent the opportunity to have parenting time before making other arrangements for L.C.'s care. In the event that either party desired to permanently relocate L.C., the agreement provided that section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2020) (governing relocation)) would control.  However, the agreement also provided as follows:

"The parties hereby retain the right to jointly agree, if they are willing and able, to terms of relocation which may vary, in whole or in part, from the specific boundaries set forth in this Section, so long as the terms to which they agree serve the bests interests of the minor child."

The agreement further provided that Axel pay child support to Jasmin, calculated in accordance with the statutory guidelines, in the amount of $514.80 each month. Axel was to continue to provide health and dental insurance for L.C. through his employment, and if he no longer received such benefits, the parties would evenly split the cost of L.C.'s medical insurance. The parties agreed to equally split the costs of unreimbursed medical expenses, public school fees, and extra-curricular activity costs not to exceed $2,000 per year per parent.

¶ 5     On May 18, 2021, Axel filed the following: (1) a motion to modify child support and (2) a "Petition to Modify Allocation Judgment: Allocation of Parental Responsibilities and Parenting Plan entered on February 4, 2019."

¶ 6     In his motion seeking to modify child support, Axel contended that a substantial change in circumstances had occurred since entry of the original child support order. He stated that L.C. had been primarily and continuously residing with him since March 12, 2020, and Jasmin was now gainfully employed full-time and earning a substantial income. He argued that his child support obligation should be terminated retroactively to March 12, 2020, and further child support be reserved pending the outcome of his petition to modify the allocation judgment.

¶ 7     In his petition to modify the allocation judgment, Axel argued that a substantial change of circumstances occurred since entry of the allocation judgment, including that pursuant to agreement of the parties, L.C. had been primarily residing with Axel, subject to parenting time with Jasmin, since March 12, 2020; Axel had continuously cared and provided support for L.C.

since that time; Jasmin did not exercise any parenting time from March 12, 2020, through July 2020, Jasmin exercised parenting time several hours one day a week from July through November 2020, and Jasmin exercised parenting time every other weekend from December 2020 through May 7, 2021; Axel moved to Yorkville, Illinois, where L.C. has resided for more than six months; Axel has been assisting L.C. with home schooling via Zoom since March 2020 through the school he was enrolled in before moving in with Axel (Maternity BVM School which is 47 miles away from where he resides in Yorkville, a one and one quarter of an hour drive each direction); L.C. has reported that Jasmin, who lives with her mother, engaged in daily verbal arguments with her mother in his presence; and Jasmin's father, whom she also lives with, tells L.C. to relay to Axel that he says "F*** you" to Axel and his girlfriend. Axel argued that the behavior of Jasmin and her parents pose a substantial risk of seriously endangering L.C.'s mental, moral, and physical health. He argued that it is in L.C.'s best interests that he be awarded sole decision-making responsibility over L.C. and that L.C.'s primary residence be with him, as it has been since March 12, 2020. Axel asked that L.C. attend a school in his school district and Jasmin be awarded parenting time that did not interfere with L.C.'s schooling.

¶ 8    Miriam Cooper was appointed guardian *ad litem* (GAL) on July 13, 2021, and mediation was waived as not being in the best interests of the parties.

¶ 9    At some point, the parties resumed the parenting-time schedule under the allocation judgment. An agreed order entered on August 20, 2021, modified the allocation judgment without prejudice until further order of the court. The order provided, *inter alia*, that Axel would have parenting time with L.C. every other weekend from after school on Fridays until 7:30 p.m. on Sundays.

¶ 10    On October 25, 2021, the parties entered an agreed order to have L.C. evaluated for "learning issues, and [to] seek guidance from his pediatrician or school personnel as to the professional who will assist the child's needs." On November 29, 2021, and January 4, 2022, two additional agreed orders were entered wherein the parents agreed to cooperate and facilitate L.C.'s evaluation for attention deficit hyperactivity disorder (ADHD). The matter was continued to February 14 for status of the evaluation and GAL report. After numerous continuances, the matter was set for an in-person hearing on August 16, 2022.

¶ 11    There was no court reporter at the hearing on August 16, 2022. As a supplement to the record on appeal, the parties submitted a bystander's report pursuant to Illinois Supreme Court Rule 323 (eff. July 1, 2017) (establishing the procedures for preparation and submission of a bystander's report if no verbatim transcript of the evidence of proceedings is obtainable). According to the bystander's report, counsel for both parties and Cooper participated in pretrial discussions with the judge, who recommended the following modification to the allocation judgement: "L.C. would attend Grande Reserve Elementary School in Yorkville (Grande Reserve School), as it had a superior rating of 9/10 on Niche.com and parenting time would be allotted to the parents as follows: L.C. would spend weekdays with Axel and certain weekends with Jasmin." Jasmin did not accept the recommendations, and the matter proceeded to trial.

¶ 12    Cooper testified, making her first report to the court as L.C.'s GAL. Her testimony was summarized in the bystander's report. Cooper has experience working in the school system and with students with special needs. She testified that L.C. initially lived with Jasmin in Chicago and attended Maternity BVM School, which is a private school near Jasmin's residence. The parties followed the original parenting-time schedule established in the allocation judgment, whereby Axel had parenting time with L.C. every Monday and every other weekend. Beginning in March

2020, L.C. began living primarily with Axel's father due to the outbreak of the COVID-19 pandemic. L.C. lived with his paternal grandfather, by agreement of the parties, until July 2020. During this time, Axel supervised L.C.'s online schooling. Cooper testified that during the summer of 2020, the parties split parenting time. Once school started in the fall of 2020, L.C. continued to attend Maternity BVM School, at first remotely and then later in person, while primarily residing with Axel. Cooper stated that in May 2021, Jasmin began enforcing the original parenting-time schedule established in the allocation judgment.

¶ 13     Cooper testified that L.C. had been struggling with attention issues and was diagnosed with ADHD in 2022 while this case was pending. She explained that Axel and Jasmin were looking for a new school for L.C. to better meet his needs due to his ADHD diagnosis. Cooper stated that she reviewed the Niche.com scores of the public schools in both Jasmin's and Axel's districts and found that the school in Axel's district had a superior rating. She reported that the school in Axel's location, Grande Reserve School, had an "A" rating on the website and the school in Jasmin's location, Bernhard Moos Elementary School in Chicago (Moos School), had a "C" rating. Cooper stated that she believed L.C. needed special services for his ADHD. Based on L.C.'s need and the reputation of Chicago public schools, she recommended L.C. attend school in Yorkville and thus live with Axel during the school week. According to the bystander's report, Cooper was asked whether she "had conducted an in-person investigation or contacted anyone from the [two] elementary schools, and whether she had investigated as to whether the schools had programs available for the treatment of ADHD." Cooper stated that she had not contacted anyone at the schools; she based her opinion on the Niche.com scores and the school systems' reputations. Cooper testified that she did not believe the transition to a new school would be detrimental to

L.C. because he was already going back and forth between his parents' homes and "this was simply a matter of changing living arrangements."

¶ 14    Cooper conducted home visits with both parents and, according to the bystander's report, she "found there was greater stability and flexibility at Axel's home given Jasmin's more extensive work schedule and Axel's ability to work from home, but also testified that she did not find 'red flags' at either home." She stated that Axel's home was warm and loving. During her visit, L.C. was happily playing with his neighborhood friends in the backyard, and she liked how safe the environment was. She noted that Axel considered himself "Mexican-married" meaning he and his girlfriend lived together and were in a long-term relationship. She stated that Jasmin's mother often watches L.C. while Jasmin is working. According to the bystander's report, Cooper stated that "L.C. seemed controlled at Axel's home and slightly more restless at Jasmin's home."

¶ 15    Axel testified next. According to the bystander's report, Axel is employed as an "HR Generalist", and he testified that "he was able to work from home, as was his girlfriend, and that this allowed him flexibility in his job." When asked if he could work from home on cross-examination, he reportedly replied, "not currently on certain days I am able to work from home upon request of my immediate supervisor, the reason being I am currently having orientation and recruitment fairs and various company projects that call for the need to be physically present on site."

¶ 16    Axel testified regarding an injury L.C. sustained while in his care. He and L.C. were at a baseball game at Busch Stadium in St. Louis. While in the restroom, L.C. was injured when Axel "in a swift movement" pulled up L.C.'s trousers from the sides. Axel thought he cleared L.C.'s front, but L.C.'s genitals were injured as he zipped L.C.'s pants for him. L.C. was seen by the stadium doctor who called the hospital. L.C. was examined in the emergency room, and the

physician told Axel to follow up by taking L.C. to a urologist. Axel reportedly "expressed remorse and guilt for the events of that day." He did not tell Jasmin right away because he was fearful that she would use the incident against him He "contemplated" for two days and told Jasmin on the third day. Axel said that he did not take L.C. to a urologist because he did not have information for a doctor.

¶ 17 According to the bystander's report, Axel stated that he used "physical force in the past to discipline" L.C., but "this was done for discipline without intention to hurt." Axel stated that he never set up child support payments through the state system as originally ordered. Instead, he paid Jasmin using "Venmo" because "he did not feel like he had to and was taking care of his child." Axel was asked why he had not replaced L.C.'s broken glasses and was shown a screenshot of a text message in which Jasmin provided him with the prescription information. Axel stated that he did not get the message.

¶ 18 Jasmin testified next. Her work hours had previously been 1:30 p.m. to 10 p.m., but due to her "seniority and flexibility at work," she has been able to adjust her work schedule and had been working 9 a.m. to 5 p.m. since June or July 2022. She also works every other weekend. Jasmin stated that her mother watches L.C. while she is at work. She testified that it is about a ten-minute drive from her place of work to L.C.'s school—so she is close by in case of an emergency. Jasmin stated that there was a time when she left work early because Axel refused to leave L.C. with her mother at a parenting-time exchange.

¶ 19 According to the bystander's report, "Jasmin testified that Axel had been verbally and physically abusive to her in the past." She testified that she was concerned about L.C. living with Axel because of this past abuse. She stated that communication had been more difficult with Axel since he began seeing his girlfriend in April or May 2021. She asserted that Axel limited her

ability to have video calls with L.C. and he prevented her from attending L.C.'s kindergarten graduation party because his girlfriend was attending. Jasmin said that she had scheduled a meeting with the Moos School for August 26 for an evaluation of L.C.'s individualized education program (IEP).

¶ 20 Jasmin also testified about the genital injury L.C. sustained while in Axel's care. She stated that the injury occurred "while L.C. was playing baseball on April 20, 2021." The injury caused scarring on L.C.'s genitals. Jasmin contended that Axel did not inform her of the injury until a month later. Thereafter, she took L.C. to a urologist who recommended circumcision as a solution, and Jasmin scheduled the procedure. She stated that she did not tell Axel about the procedure until the night before and explained that she assumed, based on prior experience, Axel would not show up. Jasmin acknowledged that L.C. sustained an injury to his forehead during the prior summer, and she did not mention the injury to Axel. According to the bystander's report, she felt Axel "did not need to know as he would not be able to do anything about the situation, and that she did not tell Axel because she did not want him to know where she worked." She acknowledged this was contrary to the parenting agreement.

¶ 21 On cross-examination, Jasmin was asked why she was comfortable with L.C. staying with Axel or his father during Covid-19, but not now. Jasmin explained that she worked in the medical field and was worried about transmitting COVID-19 during the pandemic. According to the bystander's report, Jasmin also explained, "Axel had become more difficult to reach now that he was dating someone" and "Axel had been willing to work with her and even drive her to see L.C. when he was single, but that this had shifted." Jasmin testified that she did not enforce the requirement that Axel pay her child support via the state system rather than Venmo because she did not know how to do so.

¶ 22    According to the bystander's report, Jasmin brought five additional witnesses to testify on her behalf, including her mother, an aunt, an uncle, and two cousins, but the trial judge instructed her to choose one witness to testify "due to time constraints and due to the witnesses being duplicative." There was no Spanish interpreter assigned to the court, and two of her additional witnesses only spoke Spanish. Therefore, she chose her cousin, Aimee Guzman, as her only other witness.

¶ 23    Aimee testified that she works with special needs children in high school settings. She testified that any school in Illinois is required to provide an IEP for any student who is determined to need one. Aimee stated further that she previously was able to assist "in moving L.C. forward quickly in evaluations." She testified that L.C. was not violent at school. According to the bystander's report, the trial judge questioned Aimee about some aggression L.C. had exhibited at school. Aimee said that she believed that she and Jasmin could work with L.C. on these issues. Aimee stated that Axel had been "manipulative and controlling" over Jasmin. According to the bystander's report, "[T]he Court responded to this testimony that it was taken into consideration, but that Aimee would be unable to be at school with [L.C.] and that he would of course not be in high school yet."

¶ 24    Closing arguments were held on August 17, 2022, via Zoom. The court issued a written order on the same day. The court found that a substantial change in circumstances had occurred since entry of the allocation judgment which warranted its modification. The court specified that at the time of the original allocation judgment, "neither party realized [L.C.] had a diagnosis of ADHD (Attention Deficit/Hyperactivity Disorder), [and] that [L.C.] initially lived with Jasmin as his primary residence, then with his paternal grandfather, then with Axel for a total of 15 months during the pandemic and now has been back with Jasmin."

¶ 25    The court found that modification of the allocation judgment was in L.C.'s best interests pursuant to the Act.  The court ordered that L.C. "shall attend the Grande Reserve School in Yorkville from Axel's house."  In support of his decision, the court noted the school ratings on Niche.com and that Cooper had "testified and opined that more resources would be available in a timelier manner" at Grande Reserve School than at Moos School.  The court expressed concern that Axel had moved several times in the past three years and noted that its decision "was contingent on Axel continuing to live in Yorkville."  The court stated that "[s]hould he move again while [L.C.] is in elementary school, the Court would re-consider this decision," noting that "[i]t is imperative that [L.C.] has consistency and frequent moves by either party are not in his best interest."

¶ 26    The court ruled that the parties would continue to have joint decision-making responsibility for L.C.'s education, religion, and extracurricular activities.  The court found that neither party had advised the other of L.C.'s medical issues in a timely manner.  He noted Axel's delay in informing Jasmin of L.C.'s genital injury and emergency room visit, Axel's failure to follow up with a urologist, Jasmin's scheduling of L.C.'s circumcision surgery without notice to Axel, Axel's failure to obtain new glasses for L.C. despite being sent the prescription information, and neither party's follow up on the "recommendations in the Advocate Illinois Masonic Medical Center [Report]" (Advocate Report) to place L.C. on a waiting list for a psychiatrist to explore the issue of medication.[1]  Jasmin was granted sole decision-making authority regarding L.C.'s medical issues subject to consultation with Axel and "the remainder of the medical provisions in the

---

[1]The trial court referred to the Advocate Report multiple times in its written decision, however, the report was not included in the record on appeal.

[allocation judgment]." Jasmin was ordered to not schedule any medical procedures without first consulting with Axel, and only the parents could make, cancel, or attend L.C.'s medical appointments or obtain any information from L.C.'s doctors. The court ruled that Axel's girlfriend could not be present at any doctor visits or procedures. Similarly, the court ordered that only the parents could attend parent-teacher conferences or speak to any school personnel, aides, coaches, therapists, or any other personnel that may come in contact with L.C.

¶ 27 Jasmin was awarded parenting time with L.C. three weekends every month (four weekends in months that have five weekends) if her work schedule allows for it. If Jasmin is unable to modify her work schedule, she will have parenting time every other weekend from after school on Friday until Sunday at 6 p.m. Jasmin was granted parenting time on all non-attendance school days from 8 a.m. until 6 p.m. The holiday schedule set forth in the original allocation judgment was to remain in effect, but the right of first refusal was eliminated "due to the distance between the parties." The summer schedule in the allocation judgment was modified to provide that the parents share the summers with parenting time alternating between them every other week.

¶ 28 The parties were ordered to follow all recommendations contained in the Advocate Report. According to the bystander's report, these recommendations included the parents immediately placing L.C. on a waiting list for a psychiatrist and cooperating with having L.C. evaluated for an IEP at the Grande Reserve School. The court noted that Axel "admitted in the [Advocate] Report to spanking [L.C.]", and the court admonished the parties that no corporal punishment of any kind was allowed. The court ordered that L.C. resume individual therapy as soon as possible, and the parents begin "co-parenting therapy/parent training/couples therapy and must also be involved in the therapy for [L.C.]" The parents were ordered to sign up for "Our Family Wizard" and all communications should be made via this shared-parenting app.

¶ 29    Axel's obligation to pay child support to Jasmin was terminated effective August 17, 2022. The court found Axel owed Jasmin $1029.60 in back child support, which the court ordered be paid to Cooper as contribution towards Jasmin's portion of Cooper's fees. In accordance with the judgment allocations, the parents would continue to equally divide uncovered medical, school, and other expenses, including the $2000 per year limit for each parent for extra-curricular activities. By agreement of the parties, no child support was ordered.

¶ 30    The court then discharged Cooper as GAL and granted her leave to file a motion for fees. This timely appeal followed.

¶ 31                                II. ANALYSIS

¶ 32    Jasmin raises three issues in this appeal. First, she argues that the trial court erred in finding that a substantial change in circumstances had occurred warranting the court's consideration of Axel's petition to modify the allocation judgment. She next contends that the trial court erred in applying the best-interests factors by giving undue weight to certain factors favoring Axel and insufficient weight to factors weighing in her favor. Finally, she argues that the trial court erred in failing to consider whether Axel's petition should have been considered a relocation petition rather than a modification petition given the distance between Axel's residence and hers.

¶ 33    As a preliminary matter, we must address Axel's contention that Jasmin's brief should be stricken for what he describes as "widespread" violations of the Illinois Supreme Court Rules. Specifically, Axel asserts that Jasmin failed to provide citations to the record throughout her brief (Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020)), her statement of facts omits matters unfavorable to her position (*id.*), and her appendix is "comprised entirely of items outside the record on appeal" (Ill. S. Ct. R. 342 (eff. October 1, 2019)). A review of the record and Jasmin's appendix reveals that Axel's argument regarding Jasmin's appendix is disingenuous. All items in Jasmin's appendix are

found in the record on appeal. Though she has omitted references to the page numbers where the items are located in the record, there is nothing from outside of the record in her appendix. Jasmin has, however, failed to provide citations to the record throughout her brief, electing instead, to cite the pages of her appendix, and her statement of facts omits some information necessary for a complete understanding of the issues before the court. The rules of procedures concerning appellate briefs are rules and not mere suggestions, and a brief that lacks any substantial conformity with the pertinent supreme court rules may be justifiably stricken. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. However, we decline to do so in this case because the violations here " 'are not so flagrant as to hinder or preclude review.' " See *Hubert v. Consolidated Medical Laboratories,* 306 Ill. App. 3d 1118, 1120 (1999) (quoting *Merrifield v. Illinois State Police Merit Board,* 294 Ill. App. 3d 520, 527 (1997)). As such, we will address the issues despite Jasmin's lack of compliance with Rule 341 in this regard. See *People v. Johnson,* 192 Ill. 2d 202, 206 (2000).

¶ 34                              A. Modification of the Allocation Judgment

¶ 35     Section 610.5 of the Act governs the modification of a parenting plan or allocation judgment allocating parental decision-making responsibilities and parenting time. It provides:

> "Except in a case concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and

that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5 (West 2020).

¶ 36 This two-step process requires trial courts to first determine whether the petitioner has established, by a preponderance of the evidence, a substantial change in circumstances based on facts that have arisen since the entry of the existing parenting plan or facts that were not anticipated when the existing plan was entered. *In re Marriage of Burns,* 2019 IL App (2d) 180715, ¶ 26. The substantial change in circumstances must directly affect the needs of the child. *In re Marriage of Diddens*, 255 Ill. App. 3d 850, 855 (1993). If the petitioner meets this burden of showing a substantial change in circumstances, the court will then determine whether modification is necessary to serve the child's best interests. *Id.*

¶ 37 A trial court's determinations concerning parental responsibilities and custody, including custody modification, are given great deference because the trial court is in a superior position to judge witness credibility, resolve conflicts in the evidence, and determine the best interests of the child. *In re Marriage of Lonvik,* 2013 IL App (2d) 120865, ¶ 33. As such, a reviewing court will not reverse the trial court's custody determination unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly evident or where the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181-82 (2002). Where the evidence permits multiple inferences, we will accept those inferences that support the trial court's order. *In re Marriage of Bates,* 212 Ill. 2d 489, 499 (2004).

¶ 38                     1. Substantial Change in Circumstances

¶ 39 Jasmin contends that at the beginning of the COVID-19 pandemic she made the difficult decision to temporarily deviate from the allocation judgment and place L.C. in the care of Axel to

protect L.C. because she worked in the health-care industry and was exposed to the COVID-19 virus. She contends that as a result of that decision, the court decided to change primary parenting time in favor of Axel, thus ordering that L.C. would reside in Axel's home instead of hers. She contends that the conditions necessitating the temporary deviation from the allocation judgment were lifted when concerns regarding the COVID-19 pandemic waned, and there was no need to make the temporary deviation permanent. Further, she contends that L.C.'s ADHD diagnosis was not a substantial change in circumstances warranting modification of the allocation judgment. Instead, L.C.'s "struggles in school are not uncommon parts of growing up, which would reasonably be anticipated on [*sic*] the parties' initial agreement."

¶ 40   In making its determination that a substantial change in circumstances occurred to justify modification of the allocation of parenting time, the trial court found (1) L.C. had been diagnosed with ADHD, which was not known when the allocation judgement was entered, and (2) that L.C. had gone from living with Jasmin as his primary residence, to living with Axel's father, and then living with Axel for a total of 15 months during the pandemic. After reviewing and considering the totality of the evidence, we determine that the trial court's finding that a substantial change in circumstances had occurred since entry of the allocation judgment was not against the manifest weight of the evidence.

¶ 41   The trial court's finding was primarily based upon L.C.'s ADHD diagnosis and Cooper's concerns that he should attend a school that could meet his needs. The record reveals that L.C.'s "learning issues" were acknowledged in an agreed order dated October 25, 2021, where the parties agreed to seek guidance from L.C.'s pediatrician or school to assess L.C.'s needs. Another agreed order was entered on January 4, 2022, wherein the parties agreed to "cooperate and facilitate the diagnostics at Advocate Children's Hospital Pediatric Development Center to complete the

evaluation for their son." Both Axel and Jasmin acknowledged that they were looking for a different school that would better meet L.C.'s needs.

¶ 42    Furthermore, several times in its written decision, the trial court referred to recommendations found in the Advocate Report. The court ordered that the "parties follow *all* the recommendations contained in the [Advocate] Report, including but not limited to, immediately placing the child on a waiting list for a child psychiatrist." (Emphasis in original). The court instructed that both parents attend the IEP meeting at Grand Reserve School and provide the school with a copy of the Advocate Report. The court ordered that L.C. "resume individual therapy as soon as possible" and the parents "immediately begin co-parenting therapy/parent training/couples therapy and [the parents] must also be involved in the therapy for [L.C.]." It is clear from the trial court's decision that the Advocate Report was essential to its determination that L.C.'s ADHD diagnosis and the objective of finding a school to meet his needs constituted a substantial change in circumstances in this case.

¶ 43    However, the Advocate Report is not part of the record on appeal. The appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error. *Foutch v. O'Bryant,* 99 Ill. 2d 389, 391-92 (1984). When the record on appeal is incomplete, a reviewing court should indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including that the court heard adequate evidence to support the decision that was rendered unless the record indicates otherwise. *Gataric v. Colak,* 2016 IL App (1st) 151281, ¶ 29. In this case, we are compelled to presume that the Advocate Report and the testimony presented at trial adequately supported the trial court's finding that L.C.'s ADHD diagnosis was a substantial change in circumstances.

¶ 44    In further support of its decision that a substantial change in circumstances occurred, the trial court noted that with the onset of the COVID-19 pandemic, L.C. had spent 15 months living away from Jasmin, first with Axel's father for a short time and the rest of the time with Axel. There is very little information in the bystander's report regarding the circumstances of the agreed change in custody.  However, it appears that the parties had been agreeing to numerous changes in parenting time outside of the terms of the allocation agreement from March 2020 until May 2021 when Axel filed his petition in this case.  According to the bystander's report, Cooper testified that Axel supervised L.C.'s online schooling with Maternity BVM School while he lived with Axel's father from March 2020 to the end of the school year.  She stated that "[o]nce school started remotely in fall 2020, L.C. continued to attend Maternity BVM School, at first remotely, then later in person, while primarily residing with Axel while seeing Jasmin periodically."  The bystander's report does not report any testimony or evidence presented at trial regarding the reasons for the continued deviation from the terms of the allocation agreement, only that it ended in May 2021 when Axel filed his petition and, according to Cooper's testimony, "Jasmin began enforcing the previously ordered allocation of parenting time."  As previously indicated, when the record on appeal is incomplete, we must presume that the court heard adequate evidence to support its decision. *Gataric,* 2016 IL App (1st) 151281, ¶ 29.  "This presumption even operates to the extent that where the record lacks information of evidence presented at a hearing, a reviewing court will not assume none was heard and that the court's order, therefore, was improper." *Id.* ¶ 30.  Given the inadequacies in the record on appeal, we must presume the court heard adequate evidence to support its decision.

¶ 45    Based on the forgoing, we cannot conclude that the trial court's decision that a substantial change in circumstances occurred to justify modification of the allocation judgment was against the manifest weight of the evidence in this case.

¶ 46                    2.  Application of the Best-Interests Factors

¶ 47    Jasmin argues that even if the court properly determined that a substantial change in circumstances occurred, the trial court's decision should be reversed because it erred in finding that modification was in L.C.'s best interests.  Specifically, she contends that the trial court failed to give proper consideration to certain evidence presented when assessing L.C.'s best interests, including, placing undue weight on Cooper's testimony regarding the Niche.com ratings of the two school districts, failure to give greater consideration to the fact that Axel had moved several times in recent years, failure to give greater consideration to Axel's lack of communication with Jasmin, and failure to show greater concern regarding Axel's admission to previously using corporal punishment with L.C.

¶ 48    Once a substantial change in circumstances is found, the trial court must determine whether modification is necessary to serve the child's best interests.  750 ILCS 5/610.5(c) (West 2020).  In determining the child's best interests for modifying parenting time, courts consider the best-interests factors set forth in section 602.7(b) of the Act: (1) the parents' wishes; (2) the child's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parties relating to caretaking of the child; (5) the interaction and interrelationship of the child with the parents and siblings or any other significant person; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and

difficulty of transporting the child, the parties' daily schedules, and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b) (West 2020).

¶ 49    A custody decision is afforded great deference because the trial court is in the superior position to judge the credibility of the witnesses and determine the best interests of the child. *In re Marriage of Bates,* 212 Ill. 2d 489, 516 (2004). After reviewing the record before us, we cannot conclude that the trial court's determination that it was in L.C.'s best interests that primary parenting time be granted to Axel was against the manifest weight of the evidence.

¶ 50    Courts may consider any relevant factors in determining the best interests of a child when allocating decision making and parenting time. "Courts have previously found school quality to be a relevant factor in determining a child's best interests." *In re G.L.,* 2017 IL App (1st) 163171, ¶ 38. Jasmin argues that the evidence regarding the comparison of the school districts in her and Axel's areas was "given an inappropriate amount of weight given its speculative nature." As previously noted, the record in this case is limited to the bystander's report summarizing the testimony presented at trial. The bystander's report reveals that L.C.'s ADHD diagnosis and his opportunity for success in school were of great concern to both parents and Cooper as GAL. Cooper testified that her opinion that the school district in Axel's area was a better option for L.C. was based on its superior Niche.com rating, the reputation of the districts, and L.C.'s needs. The

trial court is in much better position than this court assess the credibility of witnesses and weight to be given to the evidence. *Bates,* 212 Ill. 2d at 516. Based on the record before us, we cannot conclude that the trial court's consideration of this factor was improper.

¶ 51     Similarly, we find unpersuasive Jasmin's contentions that certain matters should have been given more weight in her favor. She asserts that the trial court should have given greater consideration to the fact that Axel had moved several times in recent years, his lack of communication with Jasmin, and his admission to previously using corporal punishment with L.C. The record reveals that the trial court did give meaningful consideration to all of these contentions and addressed each one in its written decision. Based on the record before us, we cannot conclude that the court's consideration of these factors was insufficient.

¶ 52     First, the court acknowledged it was "concerned" that Axel had moved several times in the past three years. The court ruled that its decision was contingent upon Axel continuing to live in Yorkville, and if he were to move again while L.C. was in elementary school, its decision would be reconsidered. The court admonished that "[i]t is imperative that [L.C.] has consistency and frequent moves by either party are not in his best interest."

¶ 53     Regarding communication, Jasmin acknowledged that the court found "the parties' non-communication as a problem," but she argues that Axel's communication was more problematic. The trial court's decision faults both parents for their lack of communication with one another, specifically noting that neither party had advised the other of medical issues in a timely manner. The limited record before us does not support Jasmin's contention that Axel was necessarily more problematic than Jasmin in this regard. Furthermore, the trial court's written decision reflects that it endeavored to foster a better relationship and better communication between the parents, both of which are in L.C.'s best interests. The court ordered that the parents continue to have joint

decision-making responsibility regarding education and other matters, but it allowed Jasmin sole decision-making responsibility regarding L.C.'s medical issues, subject to consultation with Axel. The court further advanced better cooperation between the parents by ordering the following: that Axel and Jasmin sign up for the Our Family Wizard app and use it exclusively for communication; that only the parents be permitted to attend appointments and communicate with school officials, therapists, doctors, or others who interact with L.C.; and that they "immediately begin co-parenting therapy/parent training/couples therapy and must also be involved in the therapy for [L.C.]"

¶ 54    Finally, the court specifically noted that "Axel admitted in the [Advocate] Report to spanking [L.C.] and shall not do so in the future, nor permit anyone in his presence or at his direction to do so." The court ordered that no corporeal punishment of any kind be allowed by anyone associated with L.C. and required both parents to immediately begin parenting training and co-parenting therapy. The trial court had the opportunity to hear the testimony of all the witnesses and review the Advocate Report regarding the issue of corporeal punishment. Based on the limited record before us, we must presume that evidence presented was adequate to support the trial court's consideration of this factor in determining L.C.'s best interests.

¶ 55    As previously stated, a trial court's decision regarding a child's best interests is given great deference on appeal. The record before us does not indicate that the opposite conclusion is clearly apparent or that the decision was unreasonable, arbitrary, or not based on the evidence. Therefore, we affirm the trial court's determination that it was in L.C.'s best interests to grant Axel primary-parenting time.

¶ 56        C. Relocation Versus Modification

¶ 57    Jasmin's final assertion is that "the trial court should have considered whether [Axel's] Petition to Modify Allocation Judgment should have been reviewed as a relocation [petition]"

pursuant to section 609.2 of the Act given the distance between Axel's home in Yorkville and hers in Chicago. See 750 ILCS 5/609.2 (West 2020). Axel contends that Jasmin waived this issue by not raising it before the trial court.

¶ 58    The facts in this case potentially raised questions regarding the applicability of section 609.2 of the Act as well as interpretation of the allocation judgment. The Act provides that "[a] parent who has been allocated a majority of parenting time or either parent who has been allocated equal parenting time may seek to relocate with a child." 750 ILCS 5/609.2(b) (West 2020). However, the allocation judgment provided that "[i]n the event that *either* party seeks to permanently relocate [L.C.]" (emphasis added), section 609.2 of the Act would control. Further, the allocation judgment provided that the parties could agree to relocation without invoking the statutory procedures:

> "The parties hereby retain the right to jointly agree, if they are willing and able, to terms of relocation which may vary, in whole or in part, from the specific boundaries set forth in this Section, so long as the terms to which they agree serve the bests interests of the minor child."

Yet another provision in the Act provides that "[a] parent's relocation constitutes a substantial change in circumstances for purposes of Section 610.5 [modification of parental decision-making responsibilities and parenting time]." 750 ILCS 5/609.2(a) (West 2020).

¶ 59    According to the bystander's report, by agreement of the parties, L.C. was not living with Jasmin for 15 months before Axel's petition was filed. He lived with Axel's father from March 2020 at the onset of the COVID-19 pandemic until June 2020. L.C. then lived primarily with Axel until May 2021 when he filed his petition and, according to Cooper, "Jasmin began enforcing" the allocation judgment. In his petition, Axel asserted that he and L.C. had already been living in

Yorkville for over six months. The issue of relocation versus modification implicates the aforementioned statutory provisions; the allocation judgment; and the circumstances of the parties' agreement to modify the allocation of parenting time, including allowing L.C. to move to Yorkville with Axel. All are matters Jasmin had the opportunity to raise before the trial court, however, she failed to do so.

¶ 60 It is well settled that a party cannot raise an issue for the first time on appeal, and any issues not raised before the trial court are deemed waived. *In re Custody of G.L.,* 2017 IL App (1st) 163171, ¶ 28. Because Jasmin failed to raise this issue of relocation at the trial court level, we deem the matter waived. Furthermore, even if we did not consider the issue waived, we would be compelled to find it forfeited because Jasmin has failed to clearly define the issue, develop a cohesive argument, and support it with authority and citation to the record. See Ill. S. Ct. R. 341 (h) (eff. Oct. 1, 2020). "[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented, and the appellate court is not a depository in which the appellant may dump the burden of argument and research." *First Mercury Insurance Co. v. Nationwide Security Services, Inc.,* 2016 IL App (1st) 143924, ¶ 21. As previously stated, this issue involves interpretation and analysis of the statute, the allocation agreement, and the facts and circumstances of the parties' agreement to modify allocation of parenting time during the 15 months before Axel filed his petition, including L.C.'s move to Yorkville with Axel. It is not our job to "scour the record and make arguments for the appellants." *Id.* Thus, even if not considered waived, this issue is forfeited.

¶ 61 III. CONCLUSION

¶ 62 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 63 Affirmed.